DAVID W. DILLEY, Plaintiff-Appellant, v. AMERICANA HEALTHCARE CORPORATION, Defendant-Appellee.

Fourth District   No. 4—84—0123

Opinion filed December 20, 1984.

GREEN, P.J., specially concurring.

Malcolm Barnes, of Urbana, for appellant.

James L. Capel, Jr., of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, of Champaign, for appellee.

JUSTICE MILLER delivered the opinion of the court:

Plaintiff David W. Dilley commenced this action in the circuit court against defendant Americana Healthcare Corporation for sex discrimination in the termination of his employment in violation of article I, section 17, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, sec. 17). The circuit court granted defendant's motion to dismiss, with prejudice, finding that the Illinois Human Rights Act (HRA) (Ill. Rev. Stat. 1983, ch. 68, par. 1—101 *et seq.*) provides the exclusive remedy for a case of this nature, with access to the courts limited to administrative review proceedings as provided therein. Plaintiff appeals from the judgment of the circuit court of Champaign County. We affirm.

The issue on appeal is whether an aggrieved party may directly sue for discrimination in employment under article I, section 17, of

the 1970 Illinois Constitution without first exhausting the administrative remedies set forth in the HRA.

The facts may be briefly stated. On November 1, 1983, plaintiff filed this action under article I, section 17, stating that he (1) was hired by defendant as patient coordinator, (2) began work on May 20, 1983, (3) attended a sales seminar over the weekend, and (4) was terminated when he returned to the facility on Monday, May 23, 1983, allegedly because of his "masculinity." He sought compensatory damages of $100,000 and punitive damages in excess of $15,000.

On December 13, 1983, defendant filed a motion to dismiss on the basis that the General Assembly, by enactment of the HRA, had "exempted" plaintiff's right to bring the circuit court action by providing that such actions must be brought under the HRA. Defendant stated that such "exemption" was authorized by the second paragraph of article I, section 17, and therefore prayed the court dismiss the complaint with prejudice for lack of subject matter jurisdiction.

On January 5, 1984, a hearing was conducted on defendant's motion to dismiss. After arguments, the circuit court held that the General Assembly has a right to provide for the Human Rights Commission, as an agency (under HRA), to have exclusive jurisdiction of discrimination cases, to establish reasonable exemptions related to the rights protected by article I, section 17, and that, in doing so, the General Assembly provided an additional remedy for the violation of those rights, which preempted the right otherwise given by the Constitution for direct action by those allegedly discriminated against on the basis of sex. The court found that the HRA provided the exclusive remedy for defendant's claim, with access to the courts limited to administrative review proceedings. Consequently, the court granted the motion to dismiss with prejudice.

The language of article I, section 17, and that of the HRA are pertinent to our resolution of the issue presented. Article I, section 17, provides:

> "All persons shall have the right to be free from discrimination on the basis of race, color, creed, national ancestry and sex in the hiring and promotion practices of any employer or in the sale or rental of property.
>
> *These rights are enforceable without action by the General Assembly, but the General Assembly by law may establish reasonable exemptions relating to these rights and provide additional remedies for their violation.*" (Emphasis added.)

Section 8—111 of the HRA provides for review under Administrative Review Law (see Ill. Rev. Stat. 1983, ch. 110, par. 3—101 *et seq.*), and

includes the following limitation:

"(D) Limitation. Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." Ill. Rev. Stat. 1983, ch. 68, par. 8—111(D).

On appeal, plaintiff presents a rather novel theory to support his argument that article I, section 17, provides a permanent private cause of action: First, he quotes language of the bill of rights committee at the constitutional convention, following committee proposal of section 17 (in proposal form referred to as section 22):

"*Since the right is explicitly made 'enforceable without action by the General Assembly,' an aggrieved person could have recourse to existing judicial* or legislative *remedies for a violation of the right.* The General Assembly is also authorized to prescribe additional remedies." (Emphasis added.) 6 Record of Proceedings, Sixth Illinois Constitutional Convention 69 (hereinafter cited as Proceedings).

Second, plaintiff looks to the language of the second paragraph of article I, section 17. He suggests that the constitutional drafters had in mind the availability of monetary damages as a remedy at law when granting authority to the General Assembly to prescribe "additional remedies." (See *Walinski v. Morrison & Morrison* (1978), 60 Ill. App. 3d 616, 377 N.E.2d 242.) Based on this precept, he argues that the authority concomitantly given the General Assembly to establish "reasonable exemptions" should not be interpreted as such a grant of power as to divest the courts of jurisdiction over a private cause of action under section 17. He urges that the drafters used the term "exemptions," as well as the term "exceptions," narrowly, *e.g.,* for a congregation to utilize a religious test in employing a minister, and not to grant the legislature power to abrogate section 17 rights which "are enforceable without action by the General Assembly." Likewise, he argues that the grant of authority to the General Assembly to provide "additional remedies" for article I, section 17, constitutional violations cannot be construed as authority to take away what the constitutional provision originally granted as an enforcement remedy—a private cause of action.

Third, plaintiff points out that article I, sections 18 ("[t]he equal protection of the laws shall not be denied or abridged on account of sex by the State or its units of local government and school districts"), and 19 ("[a]ll persons with a physical or mental handicap shall be free from discrimination in the sale or rental of property and shall be free from discrimination unrelated to ability in the hiring and

promotion practices of any employer") of the 1970 Illinois Constitution do not contain comparable provisions allowing enforceability without legislative action, or granting authority for legislative enactment of additional remedies. He therefore contends that claims under sections 18 and 19 can only be brought under the HRA because of the limitation on court jurisdiction under section 8—111(D), whereas the "self-executing language" and use of the term "additional remedies" in section 17 give him a choice of forum.

Fourth, plaintiff maintains that in drafting section 8—111(D) of the HRA, the limitations section, legislators inserted the opening language, "except as otherwise provided by law," specifically with the holding of *Walinski* in mind—that those whose article I, section 17, constitutional rights are violated are entitled to seek compensatory and punitive damages in the circuit courts—and that the opening clause reflects the *legislature's intention to preserve a private cause of action* for those claiming violation of rights protected under article I, section 17.

Further, plaintiff argues that policies favoring exhaustion of administrative procedures are irrelevant when they run counter to the constitutionally mandated policies of article I, section 17, and the right of direct access to the courts. He states that direct access to the court was established as an inviolable right by the drafters of section 17 for two reasons: (1) section 17 rights were deemed to be of the highest priority, and (2) legislatively established remedies may fall short of or impede full and immediate redress to these rights. Plaintiff fails, however, to offer any explanation of how the HRA would fall short of or impede him from immediate redress, and supports his theory only by reference to a law review article (see Gertz, *The Unrealized Expectations of Article I, Section 17*, 11 J. Mar. J. Prac. & Proc. 283 (1978)).

We reject plaintiff's argument.

At the outset, several points need be made with regard to the *Walinski* decision. In *Walinski*, the plaintiff filed a civil action for damages, claiming sex discrimination in hiring by the employer in violation of the rights in article I, section 17. She sought actual damages of $1,000, punitive damages of $4,000, plus costs of suit. The defendant filed a motion to dismiss the complaint as failing to state allegations sufficient to warrant the relief sought, since article I, section 17, does not specifically provide for the remedy of damages. The motion was granted by the circuit court, and the plaintiff appealed. After examining the debates of the Sixth Illinois Constitutional Convention, the reviewing court concluded the drafters intended that money dam-

ages be obtainable as a remedy for violation of article I, section 17, rights. The court therefore reversed the order, dismissing plaintiff's amended complaint, and remanded the cause for trial on the merits.

First, the alleged discrimination in *Walinski* occurred in 1975, when the Fair Employment Practices Act (FEPA) (see Ill. Rev. Stat. 1975, ch. 48, pars. 851 through 867), predecessor to the HRA, provided that sex discrimination in hiring was an unfair employment practice (Ill. Rev. Stat. 1975, ch. 48, par. 853(a)). By contrast, at the time article I, section 17, was enacted, the FEPA did *not* prohibit discrimination in employment on the basis of sex. (Ill. Rev. Stat. 1969, ch. 48, par. 851.) The FEPA was amended after passage of the 1970 Constitution to include in its protections discrimination on the basis of sex in employment. (Ill. Rev. Stat. 1971, ch. 48, par. 851; Pub. Act 77–1342, sec. 1, eff. August 27, 1971.) Similarly, there was no comprehensive program to prohibit discrimination in its various forms in housing. We note that delegates to the constitutional convention were made aware of these statutory deficiencies. See remarks between Mr. Connor and Mr. Wilson, 3 Proceedings 1596, col. 1, and remarks of President Witwer, addressed to discrimination in employment and housing, at 1611.

Second, after examination of the debates of the Sixth Illinois Constitutional Convention of 1969-1970, we agree with the *Walinski* court that the drafters intended money damages be obtainable as a remedy in the courts. This must be viewed, however, in the context of the *absence* of administrative recourse for violation of these rights, as has subsequently been provided by the General Assembly.

Third, it should be noted that at the time of the *Walinski* decision, the FEPA did not contain language purporting to limit circuit court jurisdiction, as does section 8—111(D) of the HRA. See Ill. Rev. Stat. 1975, ch. 48, par. 860.

Fourth, we find *Walinski* inapposite as it *did not address whether the plaintiff's claim of sex discrimination should have been pursued in the administrative forum.*

We next consider the decision in *Thakkar v. Wilson Enterprises, Inc.* (1983), 120 Ill. App. 3d 878, 458 N.E.2d 985, cited by the defendant as supplemental authority. In *Thakkar*, the plaintiff, an East Indian, brought an action in the circuit court against the defendant, alleging discrimination in termination of his employment on the basis of national origin in violation of article I, section 17, of the Illinois Constitution of 1970. On defendant's motion, the circuit court dismissed the complaint, stating (1) the plaintiff had failed to comply with statutory provisions of the FEPA, and its successor act, the HRA, which

constituted reasonable exemptions to article I, section 17; and (2) the "hiring and promotion practices" language of section 17 included discharges and terminations of employment. On appeal, the reviewing court affirmed, rejecting plaintiff Thakkar's argument that neither the FEPA nor its successor, the HRA, comprised "reasonable exemptions" referred to in article I, section 17, because the constitutional language was enacted in 1970, nine years *after* enactment of the FEPA in 1961. Thakkar had argued that section 17 constituted a second or alternative avenue to redress an employment discrimination dispute.

Reviewing the detailed legislative scheme of the HRA, the *Thakkar* court concluded that the General Assembly had intended it to be the preemptive vehicle for the resolution of employment discrimination cases in Illinois. The court stated that the comprehensive remedial procedures of the Act indicated the legislature's intent that the constitutional rights set forth in section 17 be harmonized with the Act. Consistent with this analysis, the court stated that the "reasonable exemptions relative to these rights" referred to in section 17 were also found, at least in part, in the HRA, citing as an example section 2—104 exemptions to civil rights violations in employment (including hiring or selecting between persons for *bona fide* occupational qualifications, giving preferential treatment to veterans, and giving or acting upon the results of any professionally developed ability test). See Ill. Rev. Stat. 1981, ch. 68, par. 2—104.

The *Thakkar* court also examined the constitutional debates of the Sixth Illinois Constitutional Convention of 1969-1970 and was convinced that the drafters intended that the "reasonable exemptions" referred to in section 17 would comprise statutory provisions enacted by the State legislature. In reviewing the legislative history, the *Thakkar* court quoted the language of the bill of rights committee (6 Proceedings 68-69) which stated:

> " 'The Committee concluded that the right to freedom from discrimination should be subject to a legislative power to establish reasonable exemptions. The subject of discrimination in employment or housing on the basis of race, color, creed, national ancestry or sex has many different facets. This is evident from the numerous exceptions written into state and federal legislation forbidding discrimination in these areas.
>
> * * *
>
> Appropriate exceptions cannot readily be treated in a constitutional provision, but they can be provided by legislation. Consequently, the new section authorizes the General Assembly

to "establish reasonable exemptions" from the rights created in the section.

Since the right is explicitly made "enforceable without action by the General Assembly," *an aggrieved person could have recourse to existing judicial or legislative remedies* for a violation of the right. The General Assembly is also authorized to prescribe additional remedies.' " (*Thakkar v. Wilson Enterprises, Inc.* (1983), 120 Ill. App. 3d 878, 882, 458 N.E.2d 985, 988.)

The *Thakkar* court concluded that the FEPA and the HRA were not independent remedies for violations of the rights guaranteed by section 17, and that a plaintiff's failure to comply with the provisions of those statutes would bar a direct cause of action. The court referred to policy reasons supporting the exhaustion of administrative remedies requirement as stated in *McKart v. United States* (1969), 395 U.S. 185, 194-95, 23 L. Ed. 2d 194, 203-04, 89 S. Ct. 1657, 1662-63: (1) The requirement avoids interruption of the administrative process; (2) it allows the involved agency to develop the necessary factual background upon which to base a decision; (3) it allows the agency to exercise its discretion or apply its particular expertise; (4) the exhaustion requirement serves to improve the efficiency of the administrative process; (5) it serves to conserve scarce judicial resources; (6) it gives the agency an opportunity to discover and correct its own errors; and (7) it avoids the possibility that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures. The *Thakkar* court determined that the limitations, administrative procedures, and remedies of the HRA were reasonable, enacted with proper authority, and intended to stand as the exclusive mechanism for enforcement of rights guaranteed by article I, section 17, of the Constitution.

We also note the recent decision in *Yount v. Hesston Corp.* (1984), 124 Ill. App. 3d 943, 464 N.E.2d 1214, wherein the court remarked that the *Thakkar* court, in *dicta*, had determined that the detailed legislative scheme of the HRA suggested persuasively that the legislature intended the Act to be the preemptive vehicle for the resolution of employment discrimination cases in this State. The *Yount* court concluded that the HRA was the exclusive remedy for violations of section 19 (handicap), article I, of the Constitution; and that the plaintiff was not entitled to maintain an independent, private cause of action.

Our own review of the debates of the constitutional convention,

the legislative history of the HRA, and the Act's provisions leads us to conclude that constitutional claims under article I, section 17, must be brought in the administrative forum.

A review of the legislative debates at the Sixth Illinois Constitutional Convention of 1969-1970 pertaining to article I, section 17 (discussed as section 22), and the amendments proposed thereto (see 3 Proceedings 1591-1613), reflects clearly that the drafters intended to provide a direct cause of action in the circuit courts to enforce the rights enumerated in the first paragraph *where those rights were not protected by legislation*. With regard to the language of the second paragraph of section 17, we also note the following remarks from the convention debates:

"MR. S. JOHNSON: Delegate Wilson, I'd like to ask you two or three questions about this self-enacting provision [paragraph 2 of section 17, article I]. Exactly how would that work? Supposing—supposing I had a grievance against someone and no remedy was found in statute law; how would I file a charge and what would happen after that?

MR. WILSON: *** [T]his provision does create a right and [if] the legislature has not set up any procedure, the courts are not powerless to find a remedy and to establish a remedy. *** In the absence of action by the legislature, the courts would decide on a case-by-case basis whether or not there has been discrimination within the purview *** of this constitutional provision.

*  *  *

MR. S. JOHNSON: What would be the limit of penalty that might be imposed? Are there any set down? And let us suppose that penalty were excessive in the mind of the individual, and he went through a series of appeals and they were upheld. Then if the General Assembly—how would they enter the picture, to put a lid on excessive penalty, let's say?

MR. WILSON: The provision gives the General Assembly the right to establish exemptions, the general nature of which I referred to in my remarks, and also to establish procedure and remedies." (3 Proceedings 1597.)

Delegate Johnson stated that paragraph 2 of section 17, the so-called "self-executing provision," meant that the laws would be written in the courts, *subject to a preemption or an overruling by the legislature*. (3 Proceedings 1601.) President Witwer remarked that many adjustments would have to be made pursuant to the amendment, and that "by providing for power in the General Assembly to create ex-

emptions and to adopt reasonable regulations," section 17 provided a forward looking measure. (3 Proceedings 1611.) We note also the following exchange:

> "MR. CONNOR: I'm interested in the expression, 'These rights shall be enforceable without action by the General Assembly.' No other provision of the bill of rights contains those words. Is that because—I have heard that this is because this was an attempt to override the nonaction of the Illinois legislature, is that true?
>
> MR. WILSON: Well, I don't know anything about that. We didn't talk about the Illinois legislature in our committee; but these words are in there for the express purpose of avoiding any contention that (1) this is a hortatory kind of statement or (2) that it is a right which does not come into play or into being or does not become effective until action is taken by the General Assembly." (3 Proceedings 1596, col. 1.)

We note also that the Convention delegates were not uniformly agreed to inclusion of paragraph 2 of section 17, as evidenced by the fact that several proposed amendments, which were rejected, would have omitted the paragraph.

We next consider the legislative history of the HRA. A review of the legislative debates on Senate Bill 1377 of the 1979 General Assembly, enacting the HRA, refutes plaintiff's argument that the legislature intended section 8—111(D) to preserve a direct cause of action in the courts for violations cognizable under article I, section 17, of the Constitution of 1970.

Senate Bill 1377 passed the Senate on May 25, 1979, with little discussion, the only comment pertinent here having been made by Senator Shapiro in introducing the bill:

> "Currently, Illinois has eleven different Acts contained in the Statutes that deal with discrimination in one form or another. These provisions differ in coverage, enforcement, penalty scope and intent. *Currently, our discrimination laws are enforced in the courts, both by criminal and civil actions and through three executive agencies.* *** I think you can all see that the confusion generated by multi-agency enforcement is counterproductive. The new Illinois Human Rights Act specifies the rights and enforcement procedures in relation to discrimination which are contained in this one Act." (Emphasis added.) (Senate Debates, May 25, 1979, at 283.)

Senate Bill 1377 was, however, subject to comment in the House—with 114 proposed amendments when it was presented for a second

reading on Friday, June 22, 1979. Representative Taylor announced amendment No. 7 to Senate Bill 1377, certainly pertinent to this inquiry:

> "*Amendment #7 seeks civil action prior to exhaustion of administrative [remedy]. It eliminates all limitation of direct action.*" (Emphasis added.) (House Debates, June 22, 1979, at 158.)

This amendment was tabled. House Debates, June 22, 1979, at 158; see also vol. 1, Legislative Synopsis & Digest 984-87 (1979).

Senate Bill 1377 had its third reading in the House on June 25, 1979. At that time, the remarks of Representative Bullock referenced elimination of direct access to the courts:

> "Senate Bill 1377 does, indeed, limit rights that are already provided under the State Constitution and the Federal Constitution on *housing [specifically protected under article I, section 17, of the 1970 Illinois Constitution]* and public accommodation. But, more specifically, Senate Bill 1377 appears to be regressive in the area of civil rights violation as misdemeanors. *It, also, appears to eliminate direct access to civil proceedings on the part of complainants.* \*\*\*" (Emphasis added.) (House Debates, June 25, 1979, at 87-88.)

On June 30, 1979, the House considered Senate Bill 1377. At the emergency session of the legislature on November 8, 1979, a matter concerning the bill was again brought before the House. Representative Braun then commented on the elimination of a private right of action:

> "[Senate Bill 1377] repeals the existing civil rights authority and replaces that authority but *abandons certain existing rights* regarding testing standards, discrimination by contractors, protections extended to the handicapped, *private right of action*, delay by respondents, *damages by wilful discrimination.* It creates a new exemption for discrimination by private clubs, religious corporations, and others." (Emphasis added.) House Debates, November 8, 1979, at 97.

In conclusion, we find nothing in the legislative debates to support plaintiff's theory that in enacting the HRA, or in the opening language of section 8—111(D), the legislature intended in any way to preserve a private cause of action for rights under article I, section 17. Indeed, the legislative history suggests to the contrary.

■ The design of the HRA is to provide uniform procedures and remedies for discrimination protected against under Illinois law. Section 1—102(c) provides specifically for the implementation of constitu-

tional guarantees, to secure and guarantee rights established by article I, sections 17, 18, and 19 of the Illinois Constitution of 1970. The Act provides a comprehensive procedure for the protection and enforcement of various rights, culminating in judicial review pursuant to Administrative Review Law. (Ill. Rev. Stat. 1983, ch. 110, par. 3—101 *et seq.*) To the end of uniformity, section 8—110 of the HRA provides for publication of decisions to assure a consistent source of precedent. Similarly, section 8—111(D) would engender uniformity by restricting such cases to one forum.

■ In our view, the limitation posed by section 8—111(D) falls squarely within this court's decision in *In re Estate of Mears* (1982), 110 Ill. App. 3d 1133, 443 N.E.2d 289, which pointed out that the circuit courts have original jurisdiction over all justiciable matters under article VI, section 9, of the Illinois Constitution of 1970. *Mears* stated that the legislature may still impose substantive conditions precedent to the exercise of that jurisdiction. "While this may sometimes erroneously be called a lack of jurisdiction, it is in reality an inability to exercise jurisdiction because the court cannot waive the condition." (*In re Estate of Mears* (1982), 110 Ill. App. 3d 1133, 1138, 443 N.E.2d 289, 293; see also *In re L.E.J.* (1983), 115 Ill. App. 3d 993, 451 N.E.2d 289; *In re Marriage of Bussey* (1984), 128 Ill. App. 3d 730.) We construe the word "have" in the statute to mean "exercise."

Affirmed.

WEBBER, J., concurs.

PRESIDING JUSTICE GREEN, concurring specially:

I concur with the decision to affirm, but do so for reasons that differ somewhat from those of the majority. I have great difficulty reconciling the express language of article I, section 17, with the conclusion that the legislature has power to limit to administrative redress the remedy for injury inflicted by conduct constituting a violation of section 17. However, although the question is a close and difficult one, I agree that the constitutional convention would not have enacted the section had not the majority of the members thought that the legislature would have such power.

Elmer Gertz, practitioner and a professor of law, was the chairman of the bill of rights committee of the Sixth Illinois Constitutional Convention which drafted the Illinois Constitution of 1970. In his subsequently written article *The Unrealized Expectations of Article I, Section 17*, 11 J. Mar. J. Prac. & Proc. 283 (1977-78), he presents a

logical argument that section 17 created a constitutional remedy of an action at law for a violation of the section and the legislature is powerless to destroy that remedy.

The wording of section 17 supports the theory of Professor Gertz. Indisputably, the first paragraph of the section sets forth the constitutional right of all persons to be free from the prohibited discrimination regardless of whether the discrimination arises from governmental action or that of private individuals or entities. The first portion of the second paragraph creates a constitutional right to a remedy without the necessity of legislative action. Such a remedy could only be a remedy in a court of law. As mentioned by the majority, Delegate Wilson pointed out that the remedy was created so that no viable contention could be made that the section was merely intended to be a pious preachment without enforceability. The third portion of that paragraph allows the legislature to "provide *additional* remedies" for those rights. (Emphasis added.) As the Gertz article points out, describing the remedies which the legislature might enact as "additional" seems to indicate that the constitutional remedy created by the first portion of the paragraph was to remain in force after the enactment of any such remedy. It is difficult to envision what these legislative remedies would be "additional" to if they would not supplement the right of action previously referred to in section 17.

Nothing in the language of the second portion of the second paragraph of section 17, authorizing the legislature to "establish reasonable exemptions" relating to the rights created, indicates an intention to empower the legislature to abolish the remedy created in the first portion. Nothing in the bill of rights committee document quoted in *Thakkar*, and subsequently by the majority, so indicates. The portion of that document contained between the portions quoted clearly indicates the committee intended the word "exemptions" to refer to the type of situations which would not give rise to a right to be free from discrimination. The omitted language stated:

> "To cite other examples, it is obviously proper for a congregation to utilize a religious test in employing a minister. Similarly, few would approve an anti-discrimination provision that absolutely prohibited the kind of indirect discrimination involved in providing housing exclusively to the aged members of certain religious or ethnic organizations, or women's groups. Persons might also be permitted some discrimination in employment or rental relationships that are on so small a scale and under circumstances so intimate that they are of a highly personal nature." 6 Proceedings 68-69.

The bill of rights committee presentation was made to the delegates as they sat as a committee of the whole. Chairman Gertz designated Delegate Wilson to be the principal spokesman. Before answering questions, Wilson made some prefatory remarks. His explanation of the use of the word "exemptions" is entirely consistent with the committee report and indicates that there was no intention to include within the meaning of the term "exemptions" limitation upon remedies for violations. Wilson said:

"We felt that the legislature should be empowered to provide for reasonable exemptions here where the balancing would be the other way around, if you please, and where in these situations we felt that the greater value lies in a freedom of choice on the part of the employer or, for example, on the part of a person furnishing the housing.

Now, let me give you an idea of some of these possible exemptions which we feel are reasonable and which the legislature would be empowered to enact. Excuse me. For example, the right of religious organizations to employ or provide housing for members of their own faith only. This could be such things as children's homes, old people's homes, and various things of that kind. The right of truly private clubs to provide housing for their own members only would be another example, in the committee's view, of a reasonable exemption. And then we run into that category which has come in a popular jargon to be known as the exemption relating to Mrs. Murphy's boarding house—that type of exemption, or—and I think under the Federal Housing Act this runs up to as much as a building with four apartments or four flats in it in which one of the apartments is actually owned—actually occupied by the owner as his own residence. Another example of a reasonable exemption would be that relating to small employers—employers, that is, of small numbers of employees. Just what this number would be, I don't know, of course; but in all these areas it was the committee's feeling that the relationship between landlord and tenant or between employer and employee was of such a intimate and personal nature that the greater value there lies in leaving a freedom of choice to the landlord or to the employer, as the case might be. Hence, we have provided that the legislature may enact these exemptions. It's not required to do so, but it has the—has the power under the clause to do so." 3 Proceedings 1592-93.

I have no doubt that in enacting the Human Rights Act, the legis-

lature intended the proceedings for redress for conduct violating that act would be administrative actions under the procedure there provided even if the conduct also violated article I, section 17. However, I have some concern with the conflict between the language of section 8—111(D) of the act and article VI, section 9, of the Illinois Constitution of 1970. Section 8—111(D) states that "except as otherwise provided by law, no court *** shall have jurisdiction over the subject of an alleged civil rights violation" except as the Act might provide. Article VI, section 9, provides that, with minor exceptions not applicable here, circuit courts shall have "original jurisdiction of all justiciable matters."

At the time of the enactment of the 1962 amendment to the Judicial Article of the Illinois Constitution of 1870 (Ill. Const. 1870, art. VI (amended), sec. 9), that article contained a provision substantially similar to the present article VI, section 9. At that time there were many legislative provisions limiting relief to administrative provisions. Obviously, the constitutional amendment was not intended to do away with the power of the legislature to so provide. (See Fins, *Re-Examination of "Jurisdiction" in Light of New Illinois Judicial Article*, 53 Ill. B.J. 8 (1964).) In fact, a further provision of that article VI, section 9, like the present provision, provided for the circuit court to have jurisdiction to review administrative decisions as the legislature might require.

Just how the power of the legislature to make administrative remedies the sole procedure for original determination of certain types of disputes meshes with the circuit court's "original jurisdiction of all justiciable matters" is not clear. The rationale cannot be that the administrative proceeding is a condition precedent to the circuit court's exercise of its original jurisdiction, because the circuit court's exercise of its power after administrative proceedings is an exercise of its power of review of administrative rulings and not an exercise of its original jurisdiction. Perhaps the legislature has the power to deem certain types of disputes to be not "justiciable."

In any event, to the extent that article I, section 17, creates a constitutional right to a cause of action at law, the legislature would be without power to deprive the court of that jurisdiction and without the power to make the exercise of that power by the circuit court erroneous. For reasons subsequently explained, I conclude that section 17 created a constitutionally prescribed cause of action at law only to the extent that the State, at any given time, does not have a reasonable legislative remedy for a violation of that section. Thus, when the Human Rights Act was enacted, providing a reasonable remedy for

covered gender discriminations, of both a public and private nature, there no longer existed a constitutional right of action at law for such discrimination. The constitutional right of action was negated by the enactment of the administrative remedy and not by the language purporting to limit the jurisdiction of the circuit court.

My conclusion is similar to that of the majority, but, as I have indicated, I analyze the matter in a somewhat different way. As with them, I consider the explanations of section 17 given to the delegates to be persuasive. The quoted question asked by Delegate S. Johnson and the answer of Delegate Wilson both spoke of the section 17 remedy in the absence of legislation. Delegate Wilson spoke of the power of the legislature to establish *"procedure* and *remedies"* (emphasis added) and indicated that the legislature could put limits on the amount of recovery.

The majority calls attention to the *Thakkar* court's reference to public policy favoring the use of administrative remedies in matters such as those involved here. The Fair Employment Practices Act was in force at the time of the Sixth Constitutional Convention. It provided for an exclusive administrative remedy for victims of discriminating practices prohibited by the Act. Professor Gertz expresses severe criticism of the effectiveness of those remedies and indicates that section 17 was intended to eliminate the exclusivity of those provisions. Such a change would have been a drastic one, but the record of the proceedings of the convention does not indicate that the delegates were ever informed of this substantial change. Rather, the whole focus of the explanation to them concerned the existence of a remedy when no remedy was provided by the legislature.

After considering the explanations of section 17 given to the delegates, the lack of explanation that it was intended to make the procedural changes asserted by plaintiff and the drastic nature of those changes, I cannot hold that the delegates intended to prevent the legislature from limiting proceedings for violations of section 17 to those of an administrative nature. The trial court properly dismissed the complaint.