APPEL, Justice.
In this case, we are called upon to determine whether the equal protection and due process provisions of the Iowa Constitution provide a direct action for damages in the context of an employment dispute between an Iowa Workers’ Compensation Commissioner and various state officials, including the Governor, the Lieutenant Governor, the Governor’s chief of staff, the Governor’s legal counsel, the Governor’s communication director, and the director of Iowa Workforce Development.
The district court granted summary judgment in favor of the defendants on the plaintiffs claims. We granted interlocutory appeal. For the reasons expressed below, we reverse in part and affirm in part the judgment of the district court.
I. Factual and Procedural Background.
This case involves claims brought against various state officials for damages related to public employment. The petition as amended named the State of Iowa and individual defendants Terry Branstad, Kimberly Reynolds, Jeffrey Boeyink, Brenna Findley, Timothy Albrecht, and Teresa Wahlert. Christopher J. Godfrey stated in the petition that he was appointed Workers’ Compensation Commissioner *846 in 2006 for a partial term and then- was subsequently appointed for a full term by Governor Chet Culver in 2009. .-Godfrey pled that the position of commissioner was statutorily defined as , a. six-year term, whereas the Iowa Constitution establishes a four-year term for the governorship. Since July of 2008 until the incidents complained of by Godfrey, ’ Godfrey alleged that his salary was $112,068.84 a year, near the maximum in the statutorily set salary range of $73,250-$112,070. See 2008 Iowa Acts ch. 1191, § 14(1), (6),
Godfrey alleged in the petition that defendant Branstad, prior to taking office, demanded Godfrey’s resignation by a letter dated December 3, 2010. Godfrey, however, asserted he refused to .resign, claiming that his position was quasi-judicial, intended to be nonpartisan, and insulated from politics because of the two-year difference in terms between the commissioner (six years) and the Governor (four years). Godfrey’s petition described several meetings with Branstad, Branstad’s staff, and some of the other individual defendants in which Godfrey was pressured to resign. Godfrey alleges that as a result of his refusal to resign, he was punished by having his salary reduced to the statutory minimum of $73,250. Godfrey claims he suffered other retaliation in the workplace at the hands of the defendants.
At issue in this interlocutory appeal are four counts alleging violation of due process and equal protection provisions of the Iowa Constitution.[1] In Count VI, Godfrey alleges defendants deprived him of. his constitutionally protected property interest in his salary without due process of law because of partisan politics and/or his sexual orientation in violation of article I, section 9 of the Iowa Constitution. In Count VII, Godfrey alleges the defendants damaged his protected liberty interest in his reputation without due process o'f law in violation of article I, section 9 by falsely claiming poor work performance. In Count VIII, Godfrey states the State of Iowa deprived Godfrey of equal protection of the laws in violation of article I, sectióh 6 by discriminating against Godfrey because of his sexual orientation. Finally, in Count IX, Godfrey alleges the individual defendants deprived him of equal protection of the laws by treating homosexual appointed state officers or homosexual individuals differently "than heterosexual appointed state officers or heteroséxual individuals, also in violation of article I, section 6 of the Iowa Constitution. Under all these claims, Godfrey asks for actual damages, punitive damages, attorney’s fees, court costs, and interest. '•
The defendants moved ' for summary judgment. According to the defendants, they were entitled to summary judgment because there is no private cause of action for money damages for violation of article I, sections 6 and 9 of the Iowa Constitution. In the alternative, the defendants argued that Godfrey’s claims were preempted by the Iowa Civil Rights Act, Iowa Code chapter 216 (2009).
The district court granted summary judgment for the defendants on the Iowa constitutional claims. The district court explained that it considered the motion for summary judgment as a motion to dismiss because neither party asserted any particular facts upon which the district court should base its decision. The district court noted that federal precedent in Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 *847 L.Ed.2d 846 (1979), and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91S.Ct. 1999, 29 L.Ed.2d 619 (1971), appeared to support a cause of action for due process violations in a wrongful termination case. Further, the district court recognized that “[significant public policy arguments favor recognition of such claims.” Nonetheless, the district court found that a recent unpublished court of appeals decision holding there are no private causes of action for violations of the Iowa Constitution was dispositive and dismissed Godfrey’s constitutional claims. See Conklin v. State, No. 14-0764, 2016 WL 1332003, at *5 (Iowa Ct. App. Mar. 25, 2015).
Godfrey applied for interlocutory review. We granted the - application. For the reasons expressed below, a majority of the court concludes that Bivens ■ claims are available under the Iowa Constitution and that the claims raised by plaintiff in Counts VI and VII were improperly dismissed. On the question of whether the Iowa Civil Rights Act provides an adequate remedy sufficient to stay any Bivens-type claim, a majority concludes that the remedy provided by chapter 216 is adequate under the facts and circumstances of this case, and that as a result, Counts VIII and IX of the plaintiffs complaint were properly dismissed.
II. Standard of Review.
A motion for summary judgment is appropriately granted when “there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.’’ Iowa R. Civ. P, 1.981(3). “We review the legal issues necessary for resolution of the constitutional claims presented within the context of the summary judgment, proceeding de novo.” Varnum v. Brien, 763 N.W.2d 862, 874 (Iowa 2009); accord Kistler v. City of Perry, 719 N.W.2d 804, 805 (Iowa 2006).
Generally, our review on a motion to dismiss is for correction of errors at law. Hedlund v. State, 875 N.W.2d 720, 724 (Iowa 2016); Mueller v. Wellmark, Inc., 818 N.W.2d 244, 253 (Iowa 2012). To the extent that we review constitutional claims within a motion to dismiss, our review is de novo. McGill v. Fish, 790 N.W.2d 113, 116-17 (Iowa 2010); State v. Taeger, 781 N.W.2d 560, 564 (Iowa 2010). If the petitioner fails to state a claim upon which relief may be granted, we will affirm a grant of a motion to dismiss. Hedlund, 875 N.W.2d at 724; King v. State, 818 N.W.2d 1, 8 (Iowa 2012). In ruling on a motion to dismiss, we accept all well-pled facts in the petition as true. Shumate v. Drake Univ., 846 N.W.2d 503, 507 (Iowa 2014); Geisler v. City Council of Cedar Falls, 769 N.W.2d 162, 165 (Iowa 2009).
III. Claims for Monetary Damages Under Article I, Section 6 and Article I, Section 9 of the Iowa Constitution.
A. Positions of the Parties.
1. Godfrey. Godfrey argues that article I, section 6 and article I, section 9 of the Iowa Constitution aré self-executing. As a result, according to Godfrey, no implementing legislation is necessary for God-frey to bring a claim against the defendants for monetary damages under the specific Iowa constitutional.provisions involved in this case.
Godfrey cites United States Supreme Court precedent as providing persuasive reasoning that some constitutional provisions are self-executing. The United States Supreme Court declared in Davis v. Burke that a constitutional provision may be said to be “self-executing” if it “supplies a sufficient rule by means of which the right given may be enjoyed and protected, or *848 the duty imposed may be enforced.” 179 U.S. 399, 403, 21 S.Ct. 210, 212, 45 L.Ed. 249 (1900). According to Godfrey, the reasoning in Davis supports his position that the due process and equal protection provisions of article I, sections 6 and 9 of the Iowa Constitution fall within the self-executing category.
Godfrey further argues that it would be illogical for the fundamental principles in these key Iowa constitutional provisions to depend upon legislative action for enforcement. In support of his argument, Godfrey cites passages in Vamum where we stated that the purpose of constitutional provisions such as the equal protection clause was to place certain subjects beyond the reach of the elected branches and instead entrust their enforcement to the courts. 763 N.W.2d at 875-76. Godfrey further cites Marbury v. Madison, in which Justice Marshall wrote, “The very essence of civil liberty certainly consists of the right of every individual to claim the protection of the laws, whenever he receives an injury.” 5 U.S. 1 Cranch 137, 163, 2 L.Ed. 60 (1803). Thus, according to Godfrey, a requirement of legislation to enforce fundamental nonmajoritarian constitutional rights makes no sense.
Godfrey recognizes that article XII, section 1 of the Iowa Constitution provides that the legislature “shall pass all laws necessary to carry [the] constitution into effect.” Godfrey emphasizes the word “necessary” in article XII, section 1. Godfrey argues that no legislation is necessary to enforce the due process and equal protections clauses of the Iowa Constitution. He cites appellate state court cases that have held that Bivens-type remedies are available notwithstanding similar language in their state constitutions. See, e.g., Widgeon v. E. Shore Hosp. Ctr., 300 Md. 520, 479 A.2d 921, 930 (1984); Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 389 A.2d 465, 476 (1978).
Turning to more modern federal cases, Godfrey draws support from Bivens, 403 U.S. 388, 91 S.Ct. 1999. In Bivens, the United States Supreme Court recognized a private cause of action for damages for violation of the search and seizure provisions of the Fourth Amendment. Id. at 397, 91 S.Ct. at 2005.
In addition to federal cases, Godfrey looks for common law support of his claims. He argues that the Restatement (Second) of Torts and English common law principles are embraced in section 874A of the Restatement (Second) of Torts, which provides,
When a legislative provision [defined in comment a as including constitutional provisions] protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using suitable existing tort action or a new cause of action analogous to an existing tort action.
Restatement (Second) of Torts § 874A & cmt. a, at 301 (Am. Law Inst. 1979) [hereinafter Restatement (Second)]. Godfrey notes many state courts that have found state constitutional provisions self-enforcing have relied upon this section of the Restatement (Second) as authoritative.
Echoing Justice Harlan’s concurrence in Bivens, Godfrey also contends that English common law long recognized a cause of action for damages for violation of rights secured by fundamental charters and constitutions. Justice Harlan also noted that if an explicit congressional authority were required to authorize a damage *849 remedy under the Constitution, then an explicit authority should also be required for equitable relief. Bivens, 403 U.S. at 405, 91 S.Ct. at 2009 (Harlan, J., concurring).
Additionally, Godfrey points to the law of remedies in support of his claims. God-frey notes that we have repeatedly provided injunctive relief for constitutional violations without any enabling legislation. See, e.g., Hensler v. City of Davenport, 790 N.W.2d 569, 590 (Iowa 2010); State v. Dudley, 766 N.W.2d 606, 622 (Iowa 2009); Varnum, 763 N.W.2d at 906.
Godfrey argues there is no ordinary common law tort or statutory action that will provide him with complete relief. With respect to common law torts, Godfrey cites Bivens, where “the Court acknowledged that the common law could not adequately regulate the government’s unique power to inflict injury upon individuals.” James J. Park, The Constitutional Tort Action as Individual Remedy, 38 Harv. C.R.-C.L. L. Rev. 393, 413 (2003); see Bivens, 403 U.S. at 394, 91 S.Ct. at 2003 (majority opinion). Godfrey also argues the statutory remedies under the Iowa Civil Rights Act are insufficient to vindicate his constitutional interests. The Iowa Civil Rights Act does not address discrimination based on partisan politics or his alleged deprivations of property or liberty as a result of partisan politics. Thus, Godfrey argues, the statutory remedy is insufficient to afford him complete relief.
Further, Godfrey notes that the remedies under the Iowa Civil Rights Act do not provide the same measure of deterrence as a Bivens action. Godfrey cites FDIC v. Meyer, 510 U.S. 471, 485, 114 S.Ct. 996, 1005, 127 L.Ed.2d 308 (1994), and Carlson v. Green, 446 U.S. 14, 21-22, 100 S.Ct. 1468, 1473, 64 L.Ed.2d 15 (1980), for the proposition that Bivens remedies offer more effective deterrence than most statutory remedies because of the availability of punitive damages and the prospect of individual liability.
Having established the general framework of analysis, Godfrey then turns to Iowa caselaw. Godfrey argues that our pri- or caselaw does not impede, and in fact supports, recognizing a private cause of action. Godfrey cites several of our early twentieth century cases which he maintains stand for the proposition that damages are available for violations of the Iowa Constitution. See, e.g., Girard v. Anderson, 219 Iowa 142, 148, 257 N.W. 400, 403 (1934); McClurg v. Brenton, 123 Iowa 368, 371, 98 N.W. 881, 882 (1904). Godfrey further claims that Conklin, the recent court of appeals case, is factually and procedurally distinguishable, was incorrectly decided, and moreover, is not binding precedent. See 2015 WL 1332003, at *1.
2. Defendants. The defendants argue that the due process and equal protection clauses of the Iowa Constitution are not self-executing. They claim the plain language of article XII, section 1 requires that “[t]he general assembly shall pass all laws necessary to carry this constitution into effect.” Iowa Const, art. XII, § 1. While Godfrey focuses on the narrow term “necessary,” the defendants draw our attention to the use of “shall” in the constitutional provision.
The defendants argue that if the drafters of the Iowa Constitution had intended the Iowa Constitution to be self-executing, they would have said so. The defendants argue that if the Iowa Constitution was, in fact, self-executing, the language in article XII, section 1 would be unnecessary. Further, the defendants point to article I, section 18, which provides that “[pjrivate property shall not be taken for public use without just compensation first being made.” Iowa Const, art. I, § 18. This pro *850 vision, defendants argue, is the only provision in the Bill of Rights which explicitly authorizes an award of money damages. The defendants note that while a number of states have enacted an analogue of 42 U.S.C. § 1983 for state constitutional claims, Iowa has not enacted such a statute.
The defendants rely on a trilogy of our prior cases to support their argument that the due process and equal protection clauses of the Iowa Constitution are not self-executing. The first case is State ex rel. Halbach v. Claussen, 216 Iowa 1079, 250 N.W. 195 (1933). In Clcmssen, this court considered whether the provisions of article IV, section 10 of the Iowa Constitution dealing with holding elections to fill vacancies for office were self-executing. Id. at 1091, 250 N.W. at 200. The Clcmssen court held that they were not. Id.
The second Iowa case cited by the defendants in support of their argument that the. due process and equal protection clauses of the . Iowa Constitution are not self-executing is Pierce v. Green, 229 Iowa 22, 294 N.W. 237 (1940). In Pierce, the plaintiff sought a writ of mandamus ordering the state tax commission to convene and directing them to exercise their honest discretion in assessing all property. Id. at 27, 294 N.W. at 242. We reversed a dismissal of the plaintiffs, action. Id. at 55, 294 N.W. at 256. In passing, the Pierce court stated that provisions of the Iowa Constitution, including the equal protection clause, “are not self-executing, but require legislative action to make them effective.” Id. at 29, 294 N.W. at 243.
The third Iowa case cited by the defendants is Van Baale v. City of Des Moines, 550 N.W.2d 153 (Iowa 1996). In Van Baale, we considered claims brought by a discharged Des Moines police officer who unsuccessfully protested his dismissal through the administrative process and through judicial review before finally bringing a separate equal protection action. Id. at 154. We held that Van Baale had failed to assert a viable equal protection claim because he did not specify any group of persons who were treated differently as a class. Id. at 157.
In addition to this substantive holding, however, the Van Baale court added additional language. Id. The Van Baale court stated,' “Although- the equal protection clause creates a constitutionally protected right, that right is not self-enforcing. Equal protection rights may be enforced only if the Congress or a legislature provides a means of redress through appropriate legislation.” Id. (citation omitted).
Defendants concede that a number of other state supreme courts have recognized direct damage actions under1 their state constitutions without specific legislation. However, defendants maintain that some of these state constitutions have different enabling clauses and other constitutional provisions. The defendants claim that these other constitutional provisions provide a stronger basis for damages action than the provisions of the Iowa Constitution.
The defendants recognize that in Bivens, the United States Supreme Court recognized a direct cause of action for a search and seizure violation of the United States Constitution. 403 U.S. at 397, 91 S.Ct. at 2005. The defendants argue that in more recent cases, the Court has retreated from its Bivens holding. See, e.g., Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 74, 122 S.Ct. 515, 523, 151 L.Ed.2d 456 (2001); Chappell v. Wallace, 462 U.S. 296, 305, 103 S.Ct. 2362, 2368, 76 L.Ed.2d 586 (1983).
The defendants assert that creating a direct cause of action for violations of the due process and equal protections clauses would violate separation, of powers. Given *851 the express language of the enabling clause granting the power to enact laws in order to effectuate the Iowa Constitution to the legislature, the courts cannot usurp the power of the legislature by declaring the due process and equal protection provisions of the Iowa Constitution to be self-executing. Defendants cite cases from other states reprising such separation of powers concerns. See, e.g., Lewis v. State, 464 Mich. 781, 629 N.W.2d 868, 871 (2001); Bandoni v. State, 715 A.2d 580, 595 (R.I. 1998).
Finally, the defendants argue that the early twentieth century cases such as McClurg, 123 Iowa 368, 98 N.W. 881, and Girard, 219 Iowa 142, 257 N.W. 400, that Godfrey cites as supporting a direct cause of action are inapposite. These cases, defendants stress, are factually and legally distinguishable from Godfrey’s case.
B. Approach of United States Supreme Court to Question of Whether Provisions of the United States Constitution Are Self-Executing for Purposes of Actions for Money Damages. This case deals with the proper interpretation of provisions of the Iowa Constitution. Although the precedents of the United States Supreme Court under the United States Constitution are not binding upon us in our interpretation of the Iowa Constitution, we may nonetheless give them respectful consideration in our independent analysis. State v. Ochoa, 792 N.W.2d 260, 267 (Iowa 2010). We may consider the persuasiveness of federal precedent, but we are by no means bound by it. State v. Short, 851 N.W.2d 474, 490 (Iowa 2014); State v. Baldon, 829 N.W.2d 785, 790 (Iowa 2013); State v. Pals, 805 N.W.2d 767, 771 (Iowa 2011).
The key modern United States Supreme Court precedent on the question of whether provisions of the United States Constitution are self-executing without legislative implementation is Bivens, 403 U.S. at 397, 91 S.Ct. at 2005. Bivens claimed that Federal Bureau of Narcotics agents entered his apartment without a warrant, arrested him, threatened to arrest his family, searched the apartment “from stem to stern,” and took him to a federal courthouse where he was interrogated, booked, and strip searched. Id. at 389, 91 S.Ct. at 2001. Bivens sought damages for the humiliation and mental suffering he sustained from the agents’ unlawful conduct based on alleged violation of the search and seizure provisions of the Fourth Amendment. Id. at 389-90, 91 S.Ct. at 2001. The agents moved to dismiss, arguing that Bivens’s only remedies existed under state law in tort for violation of the right to privacy. Id. at 390, 91 S.Ct. at 2001-02. The agents argued that the Fourth Amendment only applied to limit the ability of the agents to defend their actions as being a valid exercise of federal power—if the agents’ actions offended the Fourth Amendment, then they would be treated under state law as private individuals. Id. at 390-91, 91 S.Ct. at 2002.
The Bivens Court rejected the agents’ argument, maintaining that when federal agents violate the Fourth Amendment their power as federal agents “does not disappear like a magic gift when it is wrongfully used.” Id. at 391-92, 91 S.Ct. at 2002. The Fourth Amendment protects individuals from wrongful conduct, whether or not state law would find fault with the same conduct if committed by a private individual. Id. at 392-94, 91 S.Ct. at 2002-OS.
The Bivens Court further explained that the privacy rights protected by state law and the Fourth Amendment may be “inconsistent or even hostile” with one another. Id. at 394,. 91 S.Ct. at 2003. For example, if a private individual is granted entry to one’s home, then the private individual *852 is not liable for trespass—had the homeowner not wished to grant the private individual entry, the homeowner could lawfully bar entry or call the police. Id. at 894-95, 91 S.Ct. at 2003-04. If, however, the individual seeking to enter is acting under federal authority, it is futile to resist entry—the police would not assist the homeowner in repelling an unwelcome federal agent. See id. at 395, 91 S.Ct. at 2004. State law may not act to expand or circumscribe federal power; only federal law may so act. Id. The Fourth Amendment, therefore, must exist as a claim independent from any other state law claims. Id.
The Bivens Court supported the imposition of damages for violations of the Fourth Amendment by explaining that an action for damages has historically been the ordinary remedy for invasions of privacy interests. Id. The Court explained it is “well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.” Id. at 396, 91 S.Ct. at 2004 (quoting Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)). In Bivens, the Court found no special factors which would urge hesitation to create a cause of action absent legislative action, citing special factors like “federal fiscal policy” and imposing liability on a congressional employee acting in excess of authority lawfully delegated by Congress. Id. at 396-97, 91 S.Ct. at 2004-05. Finally, the Court explained, actions for damages have riot been expressly forbidden by Congress in favor of another remedy which Congress views as equally effective. Id. at 397, 91 S.Ct. at 2005.
• Justice Harlan concurred in the judgment, explaining that it was uncóntrover-sial that Bivens had a right to be free from unlawful searches and seizures, but that the real question was whether the Constitution placed the ability to create an action for' damages for constitutional violations exclusively in the hands of Congress. Id. at 399-400, 91 S.Ct. at 2006 (Harlan, J., concurring). Justice Harlan reasoned that the Supreme Court possessed the authority to create an action for damages because (1) the decision to grant damages does not involve “policy considerations not susceptible of judicial discernment”; (2) the Court has always had the power to grant equitable relief for invasions of constitutional interests without explicit congressional authorization and
if a general grant of jurisdiction to the federal courts by Congress is thought adequate to empower a federal court to grant equitable relief ... then it seems ... that the same statute is sufficient to empower a federal court to grant a traditional remedy at law;
(3) state remedies for violations of common law rights are limited when applied to federal officials acting under color of law; (4) injuries of the kind Bivens suffered cannot be remedied by an injunction—they have already occurred; and (5) recognizing a cause of action for damages would likely not result in a great expenditure of judicial resources hearing such claims because (a) these claims would rarely be successful due to jury hostility, and (b) Fourth Amendment interests rank highly on a “scale of social values” compared to other interests which are already protected by the availability of an action for damages. Id. at 402-11, 91 S.Ct. at 2008-12.
A few years after Bivens, the Supreme Court held that a woman who alleged she had been discriminated against on the basis of sex by a congressman had a cause of action for damages under the Fifth Amendment’s Due Process Clause and its equal protection component. Passman, 442 U.S. at 248, 99 S.Ct. at 2279. After deter *853 mining the plaintiff had a protected right to be free of sexual discrimination under the Fifth Amendment, the Passman Court next asked whether there were any special factors counseling hesitation such that a Bivens remedy for damages should not be granted without Congressional authorization. Id. at 245, 99 S.Ct. at 2277.
To answer whether there were “special factors” counseling hesitation, the Pass-man Court reviewed considerations addressed by the Bivens majority and Justice Harlan’s concurrence in Bivens. Id. at 245-48, 99 S.Ct. at 2277-79. First, the Court found damages are an appropriate remedy for due process and equal protection violations because, as described in Bivens, damages are the ordinary remedy for invasion of “personal interests in liberty.” Id. at 245, 99 S.Ct. at 2277 (quoting Bivens, 403 U.S. at 395, 91 S.Ct. at 2004 (majority opinion)). Additionally; the Court reasoned that courts will not encounter difficulty in measuring damages due to the experience that courts have in evaluating claims for back pay as a result of sex discrimination. Id. Moreover, according to the Court, equitable relief would not make the plaintiff whole. Id. In a statement that has become epigrammatic, the Court noted “it is damages or nothing.” Id. (quoting Bivens, 403 U.S. at 410, 91 S.Ct. at 2012 (Harlan, J., concurring)).
Second, the Passman Court noted that a suit against a congressman does raise special concerns counseling hesitation. Id. at 246, 99 S.Ct. at 2277. These special concerns, however, should be addressed'by reference to the Speech or Debate Clause, which provides principles for determining when a congressman is not acting as á congressman but as an ordinary employer. Id.’, see U.S. Const, art. I, § 6, cl. 1. The Court further explained that congressmen are not above the law. Passman, 442 U.S. at 246, 99 S.Ct. at 2277. Therefore, the Court held, if the congressman’s actions were not shielded by the Speech or Debate Clause, then the plaintiffs suit could go forward. Id.
Third, the Passman Court found that Congress had not explicitly declared that a suit for damages is not available in a federal employment discrimination case. Id. at S46-47, 99 S.Ct. at 2278. The Court found no evidence that Title VII of the 1964 Civil Rights Act was intended to foreclose alternative remedies; Id. at 247, 99 S.Ct. at 2278.
Fourth, and finally, the Passman Court did not perceive the potential for a “deluge” of federal claims if a Bivens claim were allowed. Id. at 248, 99 S.Ct. at 2278. For one thing, 42 U.S.C. § 1983 already existed' to provide recovery for plaintiffs when the injuries occurred under color of state law. Id. The Court reasoned that not every tort committed by a federal official would represent a constitutional violation—the necessity of first demonstrating a violation of constitutional rights is a significant hurdle that few plaintiffs could successfully vault. Id.
The Passman Court concluded by noting that if Congress created an equally effective alternative remedy, the need for a direct constitutional action for damages “might be obviated.” Id. The Court, however, seemed to stress the “might” by quoting Justice Harlan’s Bivens’s concurrence,
Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment oh the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of *854 otherwise sound constitutional principles.
Id. at 248, 99 S.Ct. at 2278-79 (quoting Bivens, 403 U.S. at 411, 91 S.Ct. at 2012).
In addition to Bivens and Passman, the Supreme Court heard a third case in which the issue of the validity of a constitutional action for damages was squarely before the Court. In Carlson, the Supreme Court recognized a Bivens action in the case of a mother who sued on behalf of her son who, she alleged, suffered injuries and died in federal prison in violation of his due process, equal protection, and Eighth Amendment rights. 446 U.S. at 16, 100 S.Ct. at 1470.
The Carlson Court explained -that when a plaintiff shows they were injured by a federal agent’s constitutional violations, the plaintiff has a right to recover damages except when (1) ■ there are “special factors counseling hesitation in the absence of [an] affirmative action by Congress,” or (2) Congress has already “provided an alternate remedy which it explicitly declared to be a substitute for a recovery directly under the Constitution and viewed as equally effective.” Id. at 18-19, 100 S.Ct. at 1471. The Court found, no special, factors counseling hesitation because federal prison officials “do not enjoy such independent status in, our constitutional scheme as to suggest that judicially created remedies against them might be inappropriate.” Id. at 19, 100 S.Ct. at 1472.
The Carlson Court next looked at the Federal Tort Claims Act to see if the Act was intended to be a substitute for recovery under the Constitution. Id. The Court held that it was not so intended, finding nothing in its legislative history to show either intent to preempt a Bivens remedy or to create an equally effective remedy for a constitutional violation. Id. Additionally, the Court found that a Bivens remedy is more effective than a remedy under the Federal Tort Claims Act because a Bivens remedy is recoverable against individuals and thus serves a deterrent purpose because individual federal officers face personal financial liability. Id. at 20-21, 100 S.Ct. at 1472-73. Further, the Court reasoned that availability of punitive damages for a Bivens action means the constitutional action is more effective than the statutory action, in which punitive damages are prohibited. Id. at 22,100 S.Ct. at 1473. The Court concluded that plainly the Federal Tort Claims Act “is not a sufficient protector of the citizens’ constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy.” Id. at 23,' 100 S.Ct. at 1474.
The parties have provided laundry lists of ■ United States Supreme Court cases which they claim either support the continuing viability of Bivens claims or show federal hostility to such claims. The defendants direct our attention to the following cases- which they claim show the Supreme Court no longer favors such claims. See Minneci v. Pollard, 565 U.S. 118, 131, 132 S.Ct 617, 626, 181 L.Ed.2d 606 (2012) (declining to recognize a Bivens action against- individual private employers running a federal prison); Wilkie v. Robbins, 551 U.S. 537, 549-62, 127 S.Ct. 2588, 2597-605, 168 L.Ed.2d 389 (2007) (denying a Bivens Fourth, and Fifth Amendment claim based on Bureau of Land Management extortion because plaintiff had ample other remedies.and because claims in the case were ill-suited for judicially crafted relief); Corr. Servs. Corp., 534 U.S. at 66, 74, 122 S.Ct. at 519, 523 (describing the holding of Bivens as “limited” and declining to allow a damages action against private corporations acting under color of federal law for a constitutional deprivation); Chappell, 462 U.S. at 300, 103 S.Ct. at *855 2365-66 (finding special factors counseling hesitation due to the unique disciplinary structure of the military establishment in a military race discrimination case).
In response, Godfrey cites a collection of cases that he claims cite Bivens and support its continued vitality. See, e,g., Groh v. Ramirez, 540 U.S. 551, 555, 124 S.Ct. 1284, 1288-89, 157 L.Ed.2d 1068 (2004) (involving a Bivens action for violation of the Fourth Amendment); Farmer v. Brennan, 511 U.S. 825, 830, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994) (concerning a Bivens action for violation of the Eighth Amendment); Mitchell v. Forsyth, 472 U.S. 511, 515, 105 S.Ct. 2806, 2809, 86 L.Ed.2d 411 (1985) (presenting a Bivens action for violation of the Fourth Amendment from wiretapping); Harlow v. Fitzgerald, 457 U.S. 800, 805, 102 S.Ct. 2727, 2731, 73 L.Ed.2d 396 (1982) (underlying suit involved Bivens claims); Butz v. Economou, 438 U.S. 478, 482-83, 98 S.Ct. 2894, 2898, 57 L.Ed.2d 895 (1978) (underlying suit involved Bivens claims).
It is no great surprise that, in the years since Bivens, the Court has been cautious about expanding its Bivens holding) and in some cases has retreated from the scope of its holding. See Vicki C. Jackson, Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence, 35 Geo. Wash. Int’l L. Rev. 521, 566-67 (2003); see also Ziglar v. Abbasi, 582 U.S. —, 137 S.Ct. 1843, 1857,198 L.Ed.2d 290 (2017) (“[T]he Court has made clear that expanding the Bivens remedy is now a ‘disfavored’ judicial activity.”). Many cases appearing to grant potentially expansive rights from' the Warren and Burger Courts have been limited or contained. See Nelson Lund, The Rehnquist Court’s Pragmatic Approach to Civil Rights, 99 Nw. U. L. Rev. 249, 288 (2004); see generally Ronald Kahn, The Supreme Court as a (Counter) Majoritarian Institution: Misperceptions of the Warren, Burger, and Rehnquist Courts, 1994 Det. C.L. Rev. 1, 5-6 (1994). But because we do not march in lockstep with federal law, the continuing viability of federal Bivens claims would be important only if later cases cast doubt on the reasoning of the original opinion.
Further, as noted by the New York Court of Appeals, the “concerns of federalism underlie much of the Supreme Court’s reluctance to expand relief available ... and thereby unduly interfere with States’ rights.” Brown v. State, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1143 (1996) (discussing actions under § 1983); see also Jennifer Friesen, Recovering Damages for State Bills of Rights Claims, 63 Tex. L. Rev. 1269, 1275 (1985) (stressing state judges should not be affected by need of federal courts to make nationally uniform rules); Gary S. Gilden, Redressing Deprivations of Rights Secured by State Constitutions Outside the Shadow of the Supreme Court’s Constitutional Remedies Jurisprudence, 115 Penn. St. L; Rev. 877, 882 (2011) (“[I]t is well settled that the Supreme Court is constrained by federalism when asked to recognize a right under the United States Constitution.... However, concerns over federal incursion ■ on the prerogative of the states do not exist when a state court enforces the guarantees of the state’s own constitution.”). We have no such federalism concerns to dilute our approach to judicially enforceable.individual rights provisions of the Iowa Constitution.
In any event, a review of the caselaw since Bivens does not show á retreat from Bivens reasoning as applied to situations like Godfrey’s. Rather, the cases show an unwillingness to expand Bivens claims beyond the Fourth Amendment circumstances in Bivens itself, the due process/equal protection/cruel and’ unusual punishment federal prison context in Carl *856 son, and the due proeess/equal protection employment discrimination context in Passman. Had cases since Passman and Carlson weakened these cases’ holdings or cast doubt on their reasoning, this information would be important in our determination of their persuasive value. As it is, Bivens, Carlson, and Passman remain to persuade us or fail to persuade on their own terms.
A final federal case of note comes from the United States District Court for the Northern District of Iowa which held a Bivens claim would be recognized under Iowa law. McCabe v. Macaulay, 551 F.Supp.2d 771, 785 (N.D. Iowa 2007). In McCabe, the plaintiffs brought Bivens actions against the defendants, who were state police officers, under both the Federal and State Constitutions, arguing that we would recognize a Bivens action under the Iowa Constitution. Id. at 784. The court discussed our holding in Cunha v. City of Algona, 334 N.W.2d 591 (Iowa 1983), in which we rejected a Bivens action against a municipal government. McCabe, 551 F.Supp.2d at 784. The federal district court explained that McCabe was distinguishable from Cunha, stating,
At most, Cunha rejects a direct cause of action under the due process clause of the Iowa Constitution for monetary damages against a local governmental entity for reasons expressed in Monell [v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018 [56 L.Ed.2d 611] (1978), a United States Supreme Court case extending § 1983 liability to local governments]. It does not address whether there is an Iowa analogue to Bivens under the common law when, as here, Iowa government officials are alleged to have violated the Iowa Constitution and the Iowa General Assembly has not specifically provided a statutory remedy for such violations.
Id. at 785. The federal district court predicted that we would be persuaded by Bivens and the state courts that have accepted Bivens claims under their state constitutions and recognize a Bivens claim under the Iowa Constitution. Id.; see Dor-wart v. Caraway, 312 Mont. 1, 58 P.3d 128, 133-36 (2002). Another federal district court agreed with McCabe that we would recognize a Bivens action under the Iowa Constitution in Peters v. Woodbury County, 979 F.Supp.2d 901, 971 (N.D. Iowa 2013).
C. State Court Cases Considering Whether State Constitutional Provisions Are Self-Executing for Purposes of Actions for Money Damages.
1. Introduction. Many other state appellate courts have had occasion to determine whether constitutional provisions in their state constitutions are self-executing for purposes of claims for money damages. See Dorwart, 58 P.3d at 138 & n.l (listing states that had recognized an implied cause of action as of 2002); Sharon N. Humble, Annotation, Implied Cause of Action for Damages for Violation of Provisions of State Constitutions, 75 A.L.R. 5th 619, 624-28 (2000). The states that have considered the issue are nearly equally divided in whether to recognize implied constitutional actions for damages[2] or *857 whether to decline to recognize such actions.[3]
*858 2. Overview of state supreme court cases holding state constitutional provisions self-executing for purposes of money damages. Among the better reasoned state supreme court decisions interpreting whether state constitutional provisions are self-executing for purposes of monetary damages are Dorwart, 312 Mont. 1, 58 P.3d 128; Brown, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129; and Corum v. University of North Carolina, 330 N.C. 761, 413 S.E.2d 276 (N.C. 1992).
In Brown, claimants brought a class action against the State of New York and other defendants for violating their rights to be free of unreasonable searches and seizures and to equal protection under the New York Bill of Rights. 652 N.Y.S.2d 223, 674 N.E.2d at 1131. The claims arose out of an incident in which every nonwhite male encountered by police during a five-day “street sweep” was stopped, interrogated, and had their hands and forearms inspected by the police after a white woman reported that a black male robbed her at knife point. Id., 652 N.Y.S.2d 223, 674 N.E.2d at 1131-32, The claimants asked the Court of Appeals of New York to recognize the action, which the court called a “constitutional tort”—a cause of action for damages under the constitution. Id. at 1132-33, 674 N.E.2d at 1131-32 (citing Bivens as well as California, Maryland, Massachusetts,' and Illinois cases recognizing state constitutional actions for damages).
The Brown court began its analysis by recognizing that New York lacked a statute authorizing damages for violations of constitutional rights, unlike 42 U.S.C. § 1981. Id. at 1137, 674 N.E.2d at 1131-32. If any damages remedy existed, therefore, it must be implied. Id. The court recognized, however, that the state constitutional provision must be self-executing in order for a court to imply an action for damages. Id. Here, the court explained, the rights to equal protection and to be free of unreasonable searches and seizures were self-executing. Id.
Surveying the caselaw from other states, the Brown court determined that, when state courts imply actions for damages under their constitutions, they do so based on either (1) the reasoning in the Restatement (Second) section 874A, (2) by analogy to Bivens, (3) common law predecessors of the constitutional provision at issue, or (4) a combination of the previous three. Id. at 1138, 674 N.E-.2d at 1131-32;[4] see Widgeon, *859 479 A.2d at 923-24 (justifying an implied action for damages under the Maryland Constitution almost entirely based on common law predecessors—specifically a trespass action for violation of right to be free of unreasonable search and seizure guaranteed by the Magna Carta).
The Brown court also explained that the 1777 New York Constitution’s provisions on equal protection and search and seizure are both based on older, common law antecedents—in the case of unreasonable search and seizure all the way back to the Magna Carta. Id. at 1138-39, 674 N.E.2d at 1131-32. The availability, of these common law antecedents supports the position that the framers of the constitution anticipated that such actions would remain available under the constitution. Id. at 1139, 674 N.E.2d at 1131-32. Additionally, the recorded debates of the New York Constitutional Convention of 1938 and contemporaneous cases show the delegates assumed that victims of unconstitutional actions could sue for damages. Id.
The Brown court also held that implying a damages remedy is consistent with the purposes of the constitutional provisions and is “necessary and appropriate to ensure the full realization of the rights they state.” Id. These provisions clearly define duties for government officers of the state. id at 1140, 674 N.E.2d at 1131-32. The abuses suffered by the claimants were exactly the sort of abuses that these constitutional provisions were designed to prevent. Id., Damages, the court stressed, “are a necessary deterrent for such misconduct. ... [I]njunctive or declaratory relief [falls] short.” Id. at 1141, 674 N.E.2d at 1131-32 (noting that because claimants were never charged with a crime, excluding any evidence resulting from their interrogations serves no deterrent purpose). Farther, damages have been historically recognized as the appropriate remedy for invasions of personal liberties. Id.
Thus, the Brown court, held that the plaintiffs had an implied right of damages under the search and seizures and equal protection clauses of the New York Constitution. Id. A dissent argued the court lacked jurisdiction based on article VI, section 9. (stating the court has jurisdiction to hear such claims as the legislature may provide) of the New York Constitution and that sovereign immunity protected the state. Id. at 1145^8, 1152-54, 674 N.E.2d at 1131-32 (Bellacosa, J., dissenting). The dissent further criticized equating constitutional damages actions with common law torts. Id. at 1148-52, 674 N.E.2d at 1131-32; see Gail Donoghue & Jonathan I. Edel-stein, Life After Brown; The Future of State Constitutional Tort Actions in New *860 York, 42 N.Y.L. Sch. L. Rev. 447, 462-71 (1998) [hereinafter Donoghue] (describing the Brown opinion and the dissent).
In Comm, the Supreme Court of North Carolina held there was a direct cause of action under the North Carolina Constitution for damages for a violation of a plaintiffs free speech rights. 413 S.E.2d at 292. Corum was a tenured professor at Appalachian State University who also held the position of Dean of Learning Resources. Id. at 280. After a dispute with other university officials regarding the location of a library collection, Corum was removed from his position as Dean, allegedly in retaliation for Corum’s vocal opposition to the move. Id. at 281-82. Corum sought damages for violating North Carolina’s constitutional provisions protecting the right to free speech, equal protection, and “fundamental principles” of liberty. Id. at 280; see also Grant E. Buckner, North Carolina’s Declaration of Rights: Fertile Ground in a Federal Climate, 36 N.C. Cent. L. Rev. 145, 157, 163 n.98 (2014) (describing North Carolina’s protection of “fundamental principles” as a rich source of individual rights, including the right to earn a livelihood through lawful business).
The Comm court emphasized the primacy of the Declaration of Rights in article I of the North Carolina Constitution. 413 S.E.2d at 290. According to the court, “The very purpose of the Declaration of Rights is to ensure that the violation of these rights is never permitted by anyone who might be invested under the Constitution with the powers of the State.” Id. The court emphasized that “[w]e give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designated to safeguard the liberty and security of the citizens in regard to both person and property.” Id.
A third illustrative case is Dorwart, 312 Mont. 1, 58 P.3d 128. In Dorwart, a judgment debtor sued a county sheriff and sheriffs deputies following seizure of property alleging due process and search and seizure violations under Federal and State Constitutions. Id. at 129-30. Law enforcement had writs of execution related to judgment indebtedness, but claimed nonexistent authority to search Dorwart’s home. Id. at 130. The Dorwart court held that the plaintiff had causes of action under the Montana Constitution for violation of the due process and search and seizure provisions. Id. at 137.
The Dorwart court began its analysis by reviewing Bivens, Passman, and Carlson. Id. at 133-36. The court noted in Bivens, the United States Supreme Court had said “[hjistorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty.... [Fjed-eral courts may use any available remedy to make good the wrong done.” Id. at 135 (alterations in original) (quoting Bivens, 403 U.S. at 395-96, 91 S.Ct. at 2004 (majority opinion)). The Dorwart court noted that damage actions were endorsed by Restatement (Second) section 874A. Id. The court cited various cases standing for the proposition that damage actions for violations of individual rights were recognized under English common law. Id. at 135-36; see Moresi v. State, 567 So.2d 1081, 1092 (La. 1990); Widgeon, 479 A.2d at 924. The court rejected the argument that common law remedies were sufficient, noting that common law causes of action intended to regulate the relationships among and between individuals are not adequate to redress the type of damage caused by the invasion of constitutional rights. Dorwart, 58 P.3d at 137.
3. Overview of state supreme court cases rejecting view that state constitutional provisions are self-executing. Several cases illustrate the reasoning behind state supreme court cases which reject the no *861 tion that state constitutional provisions are self-executing for purposes of actions for money damages.
The Supreme Court of Oregon rejected a constitutionally based claim for money damages in Hunter v. City of Eugene, 309 Or. 298, 787 P.2d 881, 884 (1990). In Hunter, striking teachers argued their state constitutional rights were violated by city employees. Id. at 882. The Oregon court rejected an action for money damages under the free speech provisions of the Oregon Constitution. Id. at 884. The court stated it was “very reluctant to impose any civil responsibility in the form of damages for violation of such a right, absent specific legislation or clear legislative intent.” Id. at 883. The court declared that “Oregon’s Bill of Rights provides no textual or historical basis for implying a right to damages for constitutional violations.” Id. Lacking legislative guidance, the court observed “this court is in a poor position to say what should or should not be compensation for violation of a state constitutional right and what limitations on liability should be imposed.” Id. at 884. The court noted that federal legislation such as 42 U.S.C. § 1983 and the Federal Civil Rights Act of 1964 provided at least some guidance for such claims on the federal level. Id. at 883.
The Texas Supreme Court rejected an action for monetary damages under the free speech and assembly clause of the Texas Constitution in City of Beaumont v. Bouillion, 896 S.W.2d 143, 150 (Tex. 1995). The Beaumont court emphasized cases which were decided based on the presence or absence of alternative remedial schemes. Id. at 147-48. The court noted that no one had presented evidence suggesting that at the time the Texas Constitution was written, it was intended to provide an implied right of damages for the violation of constitutional rights. Id. at 148. The court further emphasized the language of the Texas Constitution, which suggested that acts in violation of constitutional provisions are void. Id. at 149.
The Colorado Supreme Court rejected a cause of action for money damages under the due process clause of the Colorado Constitution in a real estate zoning matter in Board of County Commissioners v. Sundheim, 926 P.2d 545, 553 (Colo. 1996) (en banc). The Sundheim court recognized that the United States Supreme Court found a cause of action for money damages in Bivens, but emphasized more recent Supreme Court cases that have declined to extend Bivens to other factual contexts. Id. at 551-52; see Bush v. Lucas, 462 U.S. 367, 390, 103 S.Ct. 2404, 2417, 76 L.Ed.2d 648 (1983); Chappell, 462 U.S. at 305, 103 S.Ct. at 2368. While the Sundheim court recognized there might be a state constitutional cause of action when there was no adequate remedy, it noted the legislature had established a framework for challenging a zoning ordinance. 926 P.2d at 553. As a result, the Sundheim court found it unnecessary to find a constitutionally based damage remedy in this case but did not necessarily rule it out under different circumstances. Id.; see also Dick Fischer Dev. No. 2, Inc. v. Dep’t of Admin., 838 P.2d 263, 268 (Alaska 1992) (denying damages for due process violation when other administrative remedies available); Rockhouse Mountain Prop. Owners Ass’n, Inc. v. Town of Conway, 127 N.H. 593, 503 A.2d 1385, 1389 (1986) (declining to find constitutional action for money damages under due process or equal protection provisions of state constitution when administrative procedures available); Shields v. Gerhart, 163 Vt. 219, 658 A.2d 924, 935-36 (1995) (declining damages for free speech violation because of legislatively created remedies); see also Lance R. Chism, Bivens-Type Actions Under State Constitutions—Will Tennessee Give You a Remedy?, 30 U. Mem. L. Rev. 409, 425 (2000) *862 (noting states not finding an action for damages usually rely on alternative legislative remedy).
D. Iowa Caselaw on Self-Executing Constitutional Claims. The Iowa Supreme Court has a long and storied tradition of deciding cutting-edge cases well in advance of later decisions of the United States Supreme Court and other courts. We were in advance of the United States Supreme Court in In re Ralph, Morris 1, 6-7 (Iowa 1839), which rejected the approach later adopted by the United States Supreme Court in the infamous Dred Scott case. See Dred Scott v. Sanford, 60 U.S. 19 How. 393, 454, 15 L.Ed. 691 (1857), superseded by constitutional amendment, U.S. Const, amend. XIV. We advanced the cause of civil rights by refusing to countenance segregation in education or public accommodations in Clark and Coger many decades before the United States Supreme Court decided Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954). See Coger v. Nw. Union Packet Co., 37 Iowa 145, 158 (1873); Clark v. Bd. of Dirs., 24 Iowa 266, 277 (1868). We invalidated sodomy statutes early on in State v. Pilcher, 242 N.W.2d 348, 359 (Iowa 1976), and we recognized gay marriage rights in Varnum, 763 N.W.2d 862, 907, well in advance of the United States Supreme Court decision in Obergefell v. Hodges, 576 U.S. —, 135 S.Ct. 2584, 2604-05, 192 L.Ed.2d 609 (2015).
Similarly, fifty years before the United States Supreme Court decided Bivens, we decided several cases finding that the search and seizure clause of the Iowa Constitution supported an action for damages without implementing legislation. In McClurg, we reversed a directed verdict in favor of the defendants on a claim for damages against an officer who conducted a search without a warrant. 123 Iowa at 371, 98 N.W. at 882. We emphasized,
The right of the citizen to occupy and enjoy his home, however mean or humble, free from arbitrary invasion ,and search, has for centuries been protected with the most solicitous care by every court in the English-speaking world, from Magna [Carta] down to the present, and is embodied in every bill of rights defining the limits of governmental power in our own republic.
Id. The right to be free from, arbitrary search and seizure, was also embraced in statute and in the common law. Id. at 372, 98 N.W. at 882.
We returned to the question of damages in the search and seizure context in Krehbiel v. Henkle, 142 Iowa 677, 121 N.W. 378 (1909). In Krehbiel, the court noted that the right of citizens to be secure in person and property against wrongful seizures and searches is “zealously safeguarded and has express recognition in our State Constitution.” Id. at 679-80, 121 N.W. at 379-80; see Iowa Const; art. I, § 8. The court declared it was “thoroughly well settled” that “a violation of this right .without reasonable ground therefor gives the injured party a right of action.” Krehbiel, 142 Iowa at 680, 121 N.W. at 380. In an appeal of the case, the court affirmed an award of punitive damages in an unspecified amount, noting that such damages were available for conduct that was “wanton and reckless, and in disregard of the plaintiffs rights.” Krehbiel v. Henkle, 152 Iowa 604, 606, 129 N.W. 945, 945 (1911).
We considered the thoroughly well settled principle that violation of article I, section 8 gives rise to- a cause of action in State v. Tonn, 195 Iowa 94, 191 N.W. 530 (1923), abrogated by State v. Cline, 617 N.W.2d 277, 291 (Iowa 2000). In Torn, we rejected the exclusionary rule for search and seizure violations. Id. at 107, 191 N.W. *863 at 536. The court in Torn, however, emphasized the rejection “would not detract one iota from the full protection vouchsafed to the citizen by the constitutional provisions,” observing, “[a] trespassing officer is liable for all wrong done in an illegal search or seizure.” Id. at 106, 191 N.W. at 535. We further said the right against unreasonable searches and seizures was “a sacred right, and one which the courts will rigidly enforce.” Id.
McClurg and Krehbiel were cited with approval in Girard, 219 Iowa at 148, 257 N.W. at 403. In Girard, consistent with the thoroughly well settled principle of our prior cases, we straightforwardly declared, “[a] violation of the state and federal constitutional provisions against the unreasonable invasion of a person’s home gives the injured party a right of action for damages for unlawful breaking and entering.” Id. Thus, a damages action for constitutional violations of search and seizure under the Iowa Constitution was thoroughly well settled in Iowa law decades before the United States Supreme Court embraced the same concept in Bivens. See Krehbiel, 142 Iowa at 680, 121 N.W. at 380.
While we held that search and seizure provisions of the Iowa Constitution are self-executing in Girard, we came to a different conclusion on article IV, section 10 of the Iowa Constitution regarding the holding of elections to fill vacancies for office. In Claussen, we came to the commonsense conclusion that this provision was not self-executing. 216 Iowa at 1091, 250 N.W. at 200. The constitutional provision itself failed to provide the necessarily detailed framework for implementing elections, referring to situations which occurred when “no mode is provided by the Constitution and laws for filling such vacancy” in offices. Id. at 1083, 250 N.W. at 197 (quoting Iowa Const. art. IV, § 10). If the vacancy were to be filled by “election of the people,” the General Assembly had to provide the machinery for the election. Id. at 1090, 250 N.W. at 200. The Iowa Supreme Court thus did not have the legislative power to create the framework for a special election in the absence of actions by other branches of government. Id. at 1091, 250 N.W. at 200.
In Pierce, we considered a mandamus claim to require the Iowa tax commission to meet and exercise its power to fairly apportion taxes. 229 Iowa at 24-26, 294 N.W. at 241-42. In passing, we stated the uniformity provisions of the Iowa Constitution “are not self-executing, but require legislative action to make them effective.” Id. at 29, 294 N.W. at 243. In context, however, the legislative action required referred to implementing legislation to establish the machinery necessary to levy taxes. See id. It • did not relate to the question of whether' a damage remedy could arise when the implementation of the uniformity provision by the state violated the uniformity clause. See id. Indeed, there is language in Pierce supportive of God-frey’s position—
[Wjhere the law imposes a duty upon a state officer and his refusal or failure to perform it affects injuriously ... the personal or property right of an individual; it cannot be that the court is without power or authority to administer an appropriate remedy.
Id. at 32, 294' N.W. at 245 (quoting McKeown v. Brown, 167 Iowa 489, 498, 149 N.W. 593, 596 (1914)).
The next case of interest is Cunha, 334 N.W.2d 591. In that case, a former prisoner sued Kossuth County for a due process violation. .Id. at 592-93. We held the plaintiff failed to state a claim on which relief could be granted. Id. at 595. Cunha was narrowly interpreted by the federal district court in McCabe, which regarded its holding as limited to the question of *864 whether a money damages remedy was available against local government and did not have anything to do with potential individual liability. McCabe, 551 F.Supp.2d at 785. In short, Cunha is similar to Meyer, where the Supreme Court declined to allow an action against a government agency on the ground there would no longer be a reason to bring actions against individual officers. See Meyer, 510 U.S. at 485, 114 S.Ct. at 1005.
Finally, in Van Baale, a terminated police officer sought to avoid the limitations on remedies provided by a civil service commission ruling by bringing an action for money damages alleging a violation of equal protection. 550 N.W.2d at 155. The plaintiff, however, failed to identify any group of persons who were treated differently by the defendants, and as a result, the equal protection claim failed as a matter of law. Id. at 157. We said, in dicta, that the equal protection clause was not self-enforcing, citing Katzenbach v. Morgan, 384 U.S. 641, 648, 86 S.Ct. 1717, 1722, 16 L.Ed.2d 828 (1966). Van Baale, 550 N.W.2d at 157. Katzenbach, however, involved a very different question than whether any provisions of a constitution were self-enforcing. Instead, the question in Katzenbach was whether congressional power to implement the Equal Protection Clause of the Fourteenth Amendment was coextensive with judicial interpretation of the Clause or whether Congress possessed broader power to extend remedies and protections than the Supreme Court might employ in the absence of congressional legislation. See 384 U.S. at 649, 86 S.Ct. at 1722. The question in Katzenbach had nothing to do with stand-alone judicial power under the Fourteenth Amendment. See id. And, the Supreme Court ultimately addressed the very issue in Passman, a case not cited by Van Baale, and came to the opposite conclusion. See Passman, 442 U.S. at 248-49, 99 S.Ct. at 2279.
E. Discussion.
1. Iowa constitutional tradition. We begin our discussion by emphasizing the importance of the Bill of Rights in our scheme of government. Unlike the federal constitutional framers who did not originally include a bill of rights and ultimately tacked them on as amendments to the United States Constitution, the framers of the Iowa Constitution put the Bill of Rights in the very first article. See Iowa Const, art. I. Further, the record of the 1857 Iowa Constitutional Convention reflects a desire of its members
to put upon record every guarantee that could be legitimately placed [in the constitution] in order that Iowa not only might be the first State in the Union, unquestionably as she is in many respects, but that she might also have the best and most clearly defined Bill of Rights.
1 The Debates of the Constitutional Convention of the State of Iowa 100 (W- Blair Lord rep. 1867), http://www.statelibrary oflowa.org/services/collections/law-library/ iaconst. And, as noted by George Ells, Chair of the Committee on the Preamble and Bill of Rights, “the Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights.” Id. at 103; see Short, 851 N.W.2d at 482.
While citation to a state motto may seem like parochial legal boosterism, the early Iowa legislature adopted a distinctly libertarian state motto: “Our liberties we prize, and our rights we will maintain.” Iowa Code § 1A.1. Our founders did not cringe at the thought of individual rights and liberties—they embraced them. “It would be incongruous to hold that our constitution is a drier source of private rights than *865 the federal constitution.” Kelley Prop. Dev., Inc. v. Town of Lebanon, 226 Conn. 314, 627 A.2d 909, 924 (1993) (Borden, J., dissenting); Corum, 413 S.E.2d at 290 (emphasizing the “primacy of the Declaration [of Rights] in the minds of the framers” and that “[t]he very purpose of the Declaration of Rights is to ensure that the violation of these rights is never permitted by anyone who might be invested under the Constitution with the powers of the State”). In Bivens, Justice Harlan declared that the Bill of Rights was “intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities.” 403 U.S. at 407, 91 S.Ct. at 2010 (Harlan, J., concurring). As further noted by Justice Harlan,
I do not think that the fact that the interest is protected by the Constitution rather than statute or common law justifies the assertion that federal courts are powerless to grant damages in the absence of explicit congressional action authorizing the remedy.
Id. at 403, 91 S.Ct. at 2008.
The view was well expressed by Chief Justice Hughes of the New Jersey Supreme Court several decades ago—“Just as the Legislature cannot abridge constitutional rights by its enactments, it cannot curtail them through its silence, and the judicial obligation to protect the fundamental rights of individuals is as old as this country.” King v. S. Jersey Nat’l Bank, 66 N.J. 161, 330 A.2d 1, 10 (1974).
We agree with Justice Harlan and Chief Justice Hughes. If these individual rights in the very first article of the Iowa Constitution are to be meaningful, they must be effectively enforced. That is the point Justice Harlan made with such clarity in Bivens. According to Justice Harlan, “the judiciary has a particular responsibility to assure the vindication of constitutional interests.” Bivens, 403 U.S. at 407, 91 S.Ct. at 2010. It would be ironic indeed if the enforcement of individual rights and liberties in the Iowa Constitution, designed to ensure that basic rights and liberties were immune from majoritarian impulses, were dependent on legislative action for enforcement. It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens. See Corum, 413 S.E.2d at 290.
It should be noted that the Iowa Constitution of 1857 tended to limit the power of the legislature while it protected the independence of the court. The Constitution of 1846 provided that the legislature appoint justices to the supreme court, but the Constitution of 1857 shifted that power away from the legislature and vested it in the people. Compare Iowa Const, art. V, §§ 3, 16 (1857), with Iowa Const, art. VI, § 3 (1846). Further, the Iowa Constitution of 1857 reflected a healthy skepticism of legislative power by structuring the legislative process by allowing only one subject in an act and prohibiting special laws, prohibiting the creation of corporations though special laws, prohibiting the state from becoming a stockholder in corporations or from paying corporate debts or liabilities, providing express limitations on banking, and by a requirement that school funds be held in a segregated account. See Iowa Const, art. Ill, §§ 29, 30 (1857); id. art. IV, §§ 1, 4-11; id. art. VII, § 1; id. art. VIII, §§ 1, 3; id. art. IX:2, § 3. This effort to control legislative action contrasts with the declarations of the founders regarding the robust character of the Bill of Rights. See David Schuman, The Right to a Remedy, 65 Temp. L. Rev. 1197, 1200 (1992) (noting popular distrust shifted from the courts to the legislatures and thus a “second wave” of state constitutions stripped “legislatures of many of their prerogatives and vest[ed] increased power in the judiciary”); G. Alan Tarr, Interpreting *866 the Separation of Powers in State Constitutions, 59 N.Y.U. Ann. Surv. Am. L. 329, 335 (2003) (describing the 19th century-trend toward limiting legislative power). We cannot imagine the founders intended to allow government wrongdoers to set their own terms of accountability through legislative action or inaction. See Susan Bandes, Reinventing Bivens: The Self-Executing Constitution, 68 S. Cal. L. Rev. 289, 340-42 (1995).
As a rhetorical device, the defendants suggest that Bivens claims for Iowa constitutional violations amount to a “new cause of action.” But we face an old problem, not a new problem. The old problem is whether courts have the power to provide an appropriate remedy for constitutional wrongs.
The notion that unconstitutional actions by government officials could lead to compensatory and exemplary damages was well established in English common law. In the highly publicized and notorious related cases of Wilkes v. Wood, (1763) 98 Eng. Rep. 489 (C.P.), and Huckle v. Money, (1763) 95 Eng. Rep. 768 (C.P.), the English courts considered cases arising out of unlawful searches and seizures conducted by Lord Halifax in an attempt to uncover the publishers of a caustic tract critical of the government in a newspaper. See William W. Greenhalgh & Mark' J, Yost, In Defense of the “Per Se” Rule: Justice Stewart’s Struggle to Preserve the Fourth Amendment’s Warrant Clause, 31 Am. Crim. L. Rev. 1013, 1025 (1994). In these cases, the juries awarded substantial damages of £ 1000 and £ 300 pounds respectively. Wilkes, 98 Eng. Rep. at 499; Huckle, 95 Eng. Rep. at 768.
In Wilkes, the plaintiffs attorneys argued the actions of Halifax were an “outrage” and “wound” on the constitution. William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning 602-1791 447 (2009). The Wilkes court recognized the damages awarded by the jury exceeded the injury. Wilkes, 98 Eng. Rep. at 498. According to the court, however,
a jury have it in their power to give damages for more than the injury received. Damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty, to deter from any such proceeding for the future, and as proof of the detestation of the jury to the action itself.
Id. at 498-99.
In Huckle, the amount of damages awarded was fifteen times the actual damages. The Court of the King’s Bench declared,
[T]he personal injury done to [Huckle] was very small, so that if the jury had been confined by their oath to consider the mere personal injury only, perhaps [£] 20 damages would have been thought damages sufficient; but the small injury done to the plaintiff, or the inconsidera-bleness of his station and rank in life did not appear to the jury in that striking light in which the great point óf law touching the liberty of the subject appeared to them at the trial.... I think they have done right in giving exemplary damages. To enter a man’s house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour; it was a most daring public attack made upon the liberty of the subject.
Huckle, 95 Eng. Rep. at 768-69.
Another similar English case arising from Lord Halifax’s indiscriminate searches was Entick v. Carrington, (1765) 95 Eng, Rep. 807 (C.P.), cited by the United States Supreme Court as a “monument of English freedom” and considered to be *867 “the true and ultimate expression of constitutional law.” Boyd v. United States, 116 U.S. 616, 626, 6 S.Ct. 524, 530, 29 L.Ed. 746 (1886), overruled in part on other grounds by Warden v. Hayden, 387 U.S. 294, 302, 87 S.Ct. 1642, 1647-48, 18 L.Ed.2d 782 (1967). The jury returned a special verdict for Entick in the amount of £ 300 if the search was unlawful, a verdict which was affirmed by the court. Entick, 95 Eng. Rep. at 811, 818. Entick has been referred to as “perhaps the most important of all constitutional law cases to be found in the law reports of England; for it gave security under the law to all who may be injured by the torts of government servants.” E.C.S. Wade, Liability in Tort of the Central Government of the United Kingdom, 29 N.Y.U. L; Rev. 1416,1416-17 (1954). All told, in cases arising out of the illegal searches and seizures associated with Lord Halifax, a total of £ 5700 was paid, a substantial sum of money in those days. George C. Thomas III, Stumbling Toward History: The Framers’ Search and Seizure World, 43 Texas Tech. L. Rev. 199, 213-14 (2010).
It is thus not surprising that Justice Harlan noted in Bivens that “[historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty,” Bivens, 403 U.S. at 395, 91 S.Ct. at 2004; see also Widgeon, 479 A.2d at 924 (emphasizing application of English precedents). According-to Justice Harlan, contemporary modes of thought at the time of the United States Constitutional Convention reflected “modes of jurisprudential thought which appeared to link ‘rights’ and ‘remedies’ in a 1:1 correlation.” Bivens, 403 U.S. at 400 n. 3, 91, S.Ct. at 2007 n.3; see John C. Jeffries, Jr., Disaggregating Constitutional Torts, 110 Yale L.J. 259, 281 (2000) (“Rights cannot sensibly be crafted apart from remedies.”).
Indeed, in one of our older precedents, we cited Entick using not only a law book citation but a citation from Howell’s State Trials, a popular compendium of English state law cases. See Sanders v. State, 2 Iowa 230, 239 (1855), Thus, the territorial Supreme Court of Iowa was well aware of the practice of English courts to award damages for constitutional violations. Older cases from other states suggest that state courts contemporaneous with the Iowa Constitutional Convention were well aware of search, and seizure developments in England and assumed that the state constitutional founders were well aware, too. See, e.g., Lincoln v. Smith, 27 Vt. 328, 346 (1855) (citing Entick and declaring the “controversy in England in relation to the validity of general warrants was well understood by the framers of our state and United States constitutions”); Fisher v. McGirr, 67 Mass. 1, 29 (1855) (stating issue of illegal searches and seizures “had been much discussed in England before the adoption of our constitution, and was probably well understood by its framers”). Not surprisingly, there are a number of early' nineteenth century cases in which state courts imposed a damage remedy for constitutional violations, including punitive damages. See, e.g., Grumon v. Raymond, 1 Conn. 40, 44 (1814) (“It would open a door for the gratification of the most malignant passions, if [the issuance of a general warrant] by a magistrate should s[c]reen him from damages.”); Simpson v. McCaffrey, 13 Ohio 508, 522 (1844) (en banc) (allowing “smart money,” which is “damages beyond compensation” for search and seizure violation); Jeffries v. Ankeny, 11 Ohio 372, 375 (1842) (permitting damages for violation of right to vote). The notion that a constitutional tort is somehow a creature of the twentieth century is thus incorrect. Jeremy M. Christiansen, State Search and Seizure: The Original Meaning, 38 U. Haw. L. Rev, 63, 82-84 (2016) (citing cases *868 showing between 1814 and 1928 numerous states recognized constitutional torts).
Further, in the common law regime, remedies at law—or damages—were usually the first choice to remedy a protected right. It is equitable remedies, not damage remedies, which reflected the innovation in the common law. See Harold J. Berman, The Origins of Historical Jurisprudence: Coke, Selden, Hale, 103 Yale L.J. 1651, 1687-88 (1994); Thomas 0. Main, Traditional Equity and Contemporary Procedure, 78 Wash. L. Rev. 429, 464-67 (2003). Equitable remedies were generally thought to be available only after legal remedies were demonstrated as inadequate. See Samuel L. Bray, The System of Equitable Remedies, 63 UCLA L. Rev. 530, 545 (2016).
The defendants’ ahistorical argument is thus upside down. The availability of damages at law is thus an ordinary remedy for violation of constitutional provisions, not some new-fangled innovation. “The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.” Marbury, 5 U.S. at 163. The real question is thus not whether a new cause of action is being created, but instead is whether the provision in question is self-executing, thereby putting a court in a position to award traditional damages.
2. Impact of Iowa Constitution article XII, section 1. Iowa Constitution article XII—the last article in the document—is entitled “Schedule.” Section 1 provides, “This constitution shall be the supreme law of the state, and any law inconsistent therewith, shall be void. The general assembly shall pass all laws necessary to cai’ry this constitution into effect.” Iowa Const, art. XII, § 1.
Notably, section 1 uses the term “this” twice. “This” constitution (and not any earlier constitution) shall be the supreme law of the State. And the general assembly shall pass all laws necessary to carry “this” constitution into effect. The double use of the term “this” in section 1 suggests a focus on transition issues and not a fundamental reworking of the power of courts to fashion remedies.
The sections that followed in article XII generally, but not always, related to transition issues. Sections 2 through 14 of the original version of article XII dealt with various proceedings, fines inuring to the state, bonds in force, elections of state officers, the meeting and makeup of the general assembly, the crafting of judicial districts, the submission of the Constitution to the people for approval, an election to strike the word “white” from various provisions of the Constitution. See Iowa Const, art. XII, §§ 2-14 (1857 original); Benjamin F. Shambaugh, The Constitutions of Iowa 279-80 (1934) [hereinafter Shambaugh], At the very end, an unusual provision was tacked on, declaring that unless otherwise directed by law, “the County of Mills shall be part of the sixth Judicial District of the State.” Iowa Const, art. XII, § 15; see Shambaugh, at 342. This latter provision has nothing to do with transition, and looks like a special concession made to someone who was at the right place at the right time.
The defendants contend that the sentence in section 1 that provides, “The general assembly shall pass all laws necessary to carry this constitution into effect” means that the provisions of the Iowa Bill of Rights in article I are not self-executing but require legislative action to be enforced. See Iowa Const, art. XII, § 1. God-frey, on the other hand, contends that article XII, section 1 only requires the general assembly to pass laws “necessary” to carry “this” constitution in effect.
*869 On this point, we agree with Godfrey. In context, we think the clear meaning of article XII, section 1 is to require the general assembly to put “this” new constitution into operation and to provide for the transition from government under the pri- or constitution to the new regime. The language in article I, section 1 was not meant to dramatically undermine effective judicial enforcement of the Iowa Bill of Rights by making remedies dependent upon legislative whim.
Further, a survey of the original 1857 Iowa Constitution demonstrates the framers knew how to use language that required the general assembly to act. There are several provisions of the constitution that expressly require the general assembly to take certain actions to implement it.[5]
Such requirements of action by the general assembly are notably absent from the Bill of Rights of article I of the Iowa Constitution with two exceptions. The general assembly “may authorize” a jury of less than twelve under article I, section 9. Iowa Const, art. I, § 9. Additionally, the general assembly “may provide” that persons may be held to answer for a criminal offense without the intervention of a grand jury. Id. art. I, § 11. But other than these two provisions, nothing in the Iowa Bill of Rights requires legislative action to ensure enforcement.
We think it clear that section 1 of the schedule article cannot swallow up the power of the judicial branch to craft remedies for constitutional violations of article I. The rights established in the Iowa Bill of Rights are not established by legislative grace, but by the people in adopting the constitution. The Iowa Bill of Rights was a big deal to the framers. We divine no desire of the 1857 framers to prevent the Iowa judiciary from performing its traditional role from a schedule article requiring the general assembly to enact necessary laws for the transition to the new constitutional government. See State v. Buckner, 223 N.J. 1, 121 A.3d 290, 298 (2015) (noting a schedule article “contains various phase-in provisions designed to facilitate the smooth transition to the 1947 constitution and several subsequent amendments” (quoting Robert F. Williams, The New Jersey State Constitution at 197 (2d ed. 2012))). The rights and remedies of the Bill of Rights are not subject to legislative dilution as “there is no elasticity in the specific guaranty of the Constitution.” Des Moines Joint Stock Land Bank of Des Moines v. Nordholm, 217 Iowa 1319, 1367, 253 N.W. 701, 725 (1934) (Claussen, C.J., *870 dissenting). It would be a remarkable development to allow a provision in the schedule article of the Iowa Constitution to eviscerate the power of courts to provide remedies for violations of the people’s rights established in article I, the article which the framers plainly thought, bar none, contained the most important provisions in the Iowa Constitution.[6]
3. Standard for determining self-execution. The federal standard for self-execution was described in Davis—
A constitutional provision may be said to be self-executing if it supplies a sufficient rule by .means, of which the right given may be enjoyed and protected, ,.. and it is not self-executing when it merely indicates principles....
... In short, if [it is] complete in itself, it executes itself. ■
179 U.S. at 403, 21 S.Ct. at 212. Ordinarily, a self-executing provision does not contain a directive to the legislature for further action. Convention Ctr. Referendum Comm. v. Bd. of Elections & Ethics, 399 A.2d 550, 552 (D.C. 1979). A provision is self-executing when it takes effect immediately “without the necessity for supplementary or enabling legislation.” Brown, 652 N.Y.S.2d 223, 674 N.E.2d at 1137; see also Corum, 413 S.E.2d at 289.
4. Application of self execution standard to due process claims involving liberty and property, interests. The United States Supreme Court considered whether claims under ,the Due Process Clause of the Fifth Amendment of the United States Constitution were enforceable in a Bivens action in Passman, 442 U.S. at 230, 99 S.Ct. at 2269. The Supreme Court concluded that they were. Id. at 244, 99 S.Ct. at 2276. Instead of using the term “self-execution,” however, the Passman Court considered whether the plaintiff bad a “cause of action,” due to how the case was decided below and argued before the Court. Id. at 232, 99 S.Ct. at 2270. The Court concluded the ambiguous term “cause of action” meant, in Passman, whether thé plaintiff had a judicially enforceable' right under the Due Process Clause of the Fifth Amendment, a meaning essentially analogous to asking' whether the Due Process Clause was self-executing. Id. at 239, 99 S.Ct. at 2274, The Court declared.that for the rights guaranteed in the Constitution to be more than mere wishes or requests, litigants mqst be able to enforce those rights in the courts when there is no other effective means to enforce them. Id. at 242, 99 S.Ct. at 2275. The Court explained it had long recognized equal protection actions under the Due Process Clause of the Fifth Amendment. Id.; see Bolling v. Sharpe, 347 U.S. 497, 498-99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).
A number of state supreme courts, both before and after Passman, have come to *871 the same conclusion, usually utilizing more conventional self-execution language. See Feldman v. City of Chicago, 363 Ill. 247, 2 N.E.2d 102, 105 (1936) (holding due process is self-executing and needs no statutory enactment); Ashton v. Brown, 339 Md. 70, 660 A.2d 447, 462 (1995); Widgeon, 479 A.2d at 923 n.5, 930; In re Wretlind, 225 Minn. 554, 32 N.W.2d 161, 167 (1948) (holding due process clause requires no legislation for enforcement); State v. Kyle, 166 Mo. 287, 65 S.W. 763, 767 (1901) (due process clause is addressed to the courts, not the legislature); Dorwart, 58 P.3d at 136; Remley v. State, 174 Misc.2d 523, 665 N.Y.S.2d 1005, 1008 (Ct. Cl. 1997) (holding due process clause self-executing); see also Old Tuckaway Assocs. Ltd. P’ship v. City of Greenfield, 180 Wis.2d 254, 509 N.W.2d 323, 328, 330 (App. 1993) (considering the merits of a direct due process claim).
We have found the due process clause of article I, section 9 of the Iowa Constitution capable of enforcement in a number of settings that did not involve damages. For instance, in Hensler v. City of Davenport, we enforced the Iowa due process clause directly by finding that a provision of a municipal ordinance which imposed a presumption of failure to exercise reasonable parental control when a child is delinquent violated a parent’s right to due process. 790 N.W.2d 569, 588-90 (Iowa 2010). We have held that procedural- due process must be afforded when an at-will public employee is discharged for reasons of dishonest, immoral, or illegal conduct. Borschel v. City of Perry, 512 N.W.2d 565, 568 (Iowa 1994).
In short, we have found the due process clause of article I, section 9 enforceable in a wide variety of settings. Iowa courts have ensured, to ■ use Davis language, that “the right given may be enjoyed and protected.” 179 U.S. at 403, 21 S.Ct. at 212. The Iowa constitutional provision regarding due process of law is thus not a -mere hortatory command, but it has been implemented, day in and day out, fpr many, many years. • It has traditionally been self-executing without remedial legislation for equitable purposes, and there is no reason to think it is not self-executing for the purposes of damages at law.
5. Application of self-executing standard to equal protection. In Passman, the United States Supreme Court, found that the Equal Protection- Clause of the Fifth Amendment of-the United States Constitution was a self-executing provision sufficient to support a Bivens-type direct damages action. 442 U.S. at 244, 99 S.Ct. at 2276. According to Passman, “the judiciary is clearly discernible as the primary means” through which the right to equal protection may be enforced. Id. at 241, 99 S.Ct. at 2275. The Passman Court quoted James Madison stating, when presenting the Bill of Rights to Congress, that when rights are incorporated into the Constitution, the judiciary will then consider themselves the guardian of those rights and thus serve as “an impenetrable bulwark against every assumption of power in the Legislative or Executive; [the judiciary] will be naturally .led to resist every encroachment upon rights.”. Id. at 241-42, 99 S.Ct. at 2275 (quoting 1 Annals of Congress 439 (1789)). The Equal Protection Clause was thus intended to be, and understood to be, enforceable by the judiciary. See id. at 244, 99 S.Ct. at 2276.
Similarly, in Brown, the Court of Appeals of New York held the New York Constitution’s equal protection clause was self-executing. 652 N.Y.S.2d 223, 674 N.E.2d at 1137. The Brown court explained that the right to equal protection in the New York Constitution is “[m]ani-festly” self-executing because it “define[s] judicially enforceable rights and provide[s] citizens with a basis for judicial relief *872 against the State if those rights are violated.” Id. The equal protection provision “imposes a clear duty- on the State and its subdivisions to ensure that all persons in the same circumstances receive the same treatment.” Id., 652 N.Y.S.2d 223, 674 N.E.2d at 1140.
A number of other states have found the equal protection provisions of state constitutions to be self-executing. See, e.g., State v. Planned Parenthood of Alaska, 35 P.3d 30, 44 (Alaska 2001) (considering merits of direct equal protection claim); Unger v. Super. Ct., 37 Cal.3d 612, 209 Cal.Rptr. 474, 692 P.2d 238, 239-43 (1984) (en banc) (considering merits of direct equal protection claim); Baker v. Miller, 159 Ill.2d 249, 201 Ill.Dec. 119, 636 N.E.2d 551, 558 (1994) (holding constitutional provision directly prohibiting discrimination in employment was self-executing); Layne v. Superintendent, 406 Mass. 156, 546 N.E.2d 166, 168-69 (1989) (considering the merits of a direct equal protection claim); Smith v. Dep’t of Pub. Health, 428 Mich. 540, 410 N.W.2d 749, 798 (1987) (considering the merits of a direct equal protection claim); In re Town Highway No. 20, 191 Vt. 231, 45 A.3d 54, 67 (2012) (holding article of state constitution prohibiting discriminatory treatment to be self-executing).
We, of course, have not hesitated to enforce the equal protection clauses of the Iowa and Federal Constitutions. For example, in Vamum we held that a law prohibiting same-sex marriage violated equal protection because there was no justification for the classification which substantially furthered any governmental objective. 763 N.W.2d at 906-07. In Dudley, we held a statute which provided for less advantageous treatment for indigent, acquitted criminal defendants than for ordinary civil judgment debtors violated the Equal Protection Clause because there was no rational basis for the classification. 766 N.W.2d at 617. In In re S.A.J.B., we held a statute providing that indigent parents defending involuntary parental rights termination proceedings under Iowa Code chapter 232 could receive state-appointed counsel but indigent parents defending involuntary parental rights termination proceedings under chapter 600A could not have state-appointed counsel was a violation of equal protection. 679 N.W.2d 645, 651 (Iowa 2004). In Glowacki v. State Board of Medical Examiners, we held that a statute prohibiting the grant of a stay in a suspension of a doctor’s license to practice medicine, but permitting stays in other professional licensure investigations, violated a doctor’s i-ight to equal protection. 501 N.W.2d 539, 542 (Iowa 1993).
Our cases clearly show that our equal protection clause has always been considered to be self-executing. We therefore reaffirm the equal protection clause of the Iowa Constitution is self-executing.
IV. Preemption of Iowa Constitutional Claims by the Iowa Civil Rights Act.
A. Introduction. The defendants suggest that any potential constitutional claim that Godfrey may have is preempted by the Iowa Civil Rights Act. At the outset, however, it is important to distinguish between preemption and the question of adequacy of the statutory remedy.
Preemption is a question of legislative intent. Ackerman v. Am. Cyanamid Co., 586 N.W.2d 208, 211 (Iowa 1998). When the legislature expressly preempts common law or other fields of law, there is no problem of statutory interpretation. State v. Martinez, 896 N.W.2d 737, 763 (Iowa 2017). The fighting issue in the preemption area is when the legislature is silent but has enacted a sufficiently comprehensive statute to suggest an implied legislative intent to occupy the field or has enacted a *873 statute so in conflict with other legal claims that preemption must be implied. See id. at 746.
The question of whether a statutory-remedy might be adequate so as to avoid the need for a direct constitutional claim has nothing to do with legislative intent. It has everything to do with a judicial determination of whether the court should not allow a direct constitutional claim for damages to proceed because the court believes an established statutory remedy is sufficient to vindicate the constitutional interests of the people expressed in the civil liberties provisions of state constitutions.
B. Positions of the Parties. Godfrey argues that Iowa constitutional rights are not preempted by Iowa Code chapter 216. Godfrey points to differences between constitutional claims and common law claims, which may be preempted under the Iowa Civil Rights Act. The sources of the rights are different and the available remedies are different. Statutory rights may be abolished by the legislature, whereas constitutional rights may only be abolished by constitutional amendment.
Godfrey directs our attention to three cases from other jurisdictions as persuasive authority standing for the premise that constitutional rights are fundamentally different from, and thus may not be preempted by, statutory rights. See Laird v. Ramirez, 884 F.Supp. 1265 (N.D. Iowa 1995); Shuttleworth v. Broward County, 639 F.Supp. 654 (S.D. Fla. 1986); Wintergreen Grp. LC v. Utah Dep’t of Transp., 171 P.3d 418 (Utah 2007). He also cites an Iowa case as standing for the premise that a plaintiff may pursue all appropriate remedies concurrently. See Gray v. Bowers, 332 N.W.2d 323, 324 (Iowa 1983).
Godfrey concludes by arguing that even if the Iowa Civil Rights Act did preempt constitutional claims, it would only preempt his allegation of discrimination based on sexual orientation, not his allegation of partisan discrimination which is not covered by the Act.
The defendants argue that Iowa Code chapter 216 is the exclusive remedy for conduct in violation of the Iowa Civil Rights Act. In support of this argument, the defendants cite our cases holding that common law torts are preempted by the Iowa Civil Rights Act. See, e.g., Greenland v. Fairtron Corp., 500 N.W.2d 36, 38 (Iowa 1993); Vaughn v. Ag Processing, Inc., 459 N.W.2d 627, 638 (Iowa 1990); Northrup v. Farmland Indus. Inc., 372 N.W.2d 193, 197 (Iowa 1985). The defendants state these and related cases stand for the rule that if discrimination is an element of a claim, then the claim is not separate and independent from the Act and is thus preempted.
Because the operative facts that give rise to constitutional claims are the same facts as those that Godfrey relies on for his constitutional claims, this proves, the defendants argue, the claims are not separate and independent from the Iowa Civil Rights Act. Therefore, the defendants conclude the constitutional claims are preempted.[7]
C. Discussion. There is little doubt the legislature has the power to supersede or abrogate common law remedies. Mark A. Geistfeld, Tort Law in the Age of Statutes, 99 Iowa L. Rev. 957, 1004 (2014); Marie K. *874 Pesando, Change or Abrogation by Statute or Constitution, 15A Am. Jur. 2d. Common Law § 15, at 741 (2011); Kimberly C. Simmons, Pre-emption of Wrongful Discharge Cause of Action by Civil Rights Laws, 21 A.L.R. 5th 1 (199,4).
We have held that the Iowa Civil Rights Act preempts some, but not all, common law claims based on discrimination. In Northrwp, for' example, we held that an employee who claimed his job was terminated because he participated in an alcohol treatment plan did not have a common law wrongful discharge claim. 372 N.W.2d at 195-97. We explained that employment contracts are presumed to be at-will under Iowa, law and we had not previously recognized a public policy exception to the rule. Id. at 196. The Iowa Civil Rights Act, however, allowed for such.,an action after following its procedures to first seek administrative relief. Id. We said, “It is clear from a reading of [the Act] that the procedure under the civil rights act is exclusive, and a claimant asserting a discriminatory practice must pursue the remedy provided by the act.” Id. at 197. The employee also raised a claim of intentional infliction of emotional distress related to the discriminatory practice—the employer did not argue that the emotional distress action was also preempted by the Iowa Civil Rights Act because we did not consider the issue. Id. at 197-98.
Subsequent to Northrwp, we recognized that an at-will employee could pursue an action for wrongful discharge if the discharge violated public policy—but, if the wrongful acts complained of violated the Iowa Civil Rights Act, the Act was the sole remedy for the wrongful discharge claim. Vaughn, 459 N.W.2d at 637-38 (Iowa 1990); see also Smidt v. Porter, 695 N.W.2d 9, 17 (Iowa 2005); Borschel, 512 N.W.2d at 567-68; Hamilton v. First Baptist Elderly Hous. Found., 436 N.W.2d 336, 341 (Iowa 1989). We also held, however, that a breach of employment contract claim based on the same facts as the claim of wrongful discharge was not preempted by the Act. Vaughn, 459 N.W.2d at 638-39; see also Grahek v. Voluntary Hosp. Co-op. Ass’n of Iowa, Inc., 473 N.W.2d 31, 33-34 (Iowa 1991) (rejecting argument that employee’s breach of contract claim was merely an artfully pled claim of discrimination). But see Polk Cty. Secondary Roads v. Iowa Civil Rights Comm’n, 468 N.W.2d 811, 816-17 (Iowa 1991) (holding contractual claim preempted by Iowa Civil Rights Act when breach was failure to follow union’s arbitration agreement and dispute resolution provision of Act rendered arbitration inappropriate).
In Greenland, we explained that when a common law claim requires “proof of discrimination,” the claim is preempted by the Iowa Civil Rights Act. 500 N.W.2d at 38. However, when a claim is separate and independent, it is an incidental cause of action and is not preempted. Id. In Greenland, we found the employee’s emotional distress claim was preempted because the outrageous conduct complained of was discrimination. Id. The employee’s assault and battery claims, however, were not preempted because they were “complete without any reference to discrimination:” Id. at 38-39; see also Channon v. United Parcel Serv., Inc., 629 N.W.2d 835, 858 (Iowa 2001) (upholding Greenland in dismissing emotional distress claim and rejecting the argument that Greenland was inconsistent with Northrwp).
D. Discussion of Preemption of Constitutional Claims. We have not heard a case concerning whether the Iowa Civil Rights Act preempts otherwise valid constitutional claims. For that matter, we have not heard a case concerning whether any legislative act can ever preempt a constitutional claim. In our caselaw, we *875 have indicated a distinction between constitutional claims and claims brought under the Iowa Civil Rights Act. As we noted in Sommers v. Iowa Civil Rights Commission, we were not “examining civil liberties protected by the Constitution, but civil rights which are enforceable claims rooted in the Iowa Civil Rights Act.”- 337 N.W.2d 470, 472 (Iowa 1983). In several cases, we considered the merits of' constitutional claims brought in tandem with statutory claims under the Iowa Civil Rights Act. See McQuistion v. City of Clinton, 872 N.W.2d 817, 832, 836 (Iowa 2015) (rejecting claims of equal protection and due process on the merits, but- remanding on the question of pregnancy discrimination under the Iowa Civil Rights Act). In these cases, however, the question of preemption does not appear to have been raised.
The long-settled principle is that a constitution trumps legislative enactments. See generally Marbury, 5 U.S. at 138 (“An act of congress repugnant to the constitution cannot become a law.”); Baldon, 829 N.W.2d at 803-10 (Appel, J., concurring) (describing the process of enacting state constitutions after independence and emphasizing the importance of state constitutions in the federal system). See generally Walt Cubberly, New Foundations for Constitutional Adjudication in State Court, 24 App. Advoc. 425 (2012) (exploring classic philosophical problems with constitutional review in the context of state constitutionalism). A basic premise of our constitutional system is that popular whim may not override the individual rights guaranteed by the Constitution. Cf. Cox v. Louisiana, 379 U.S. 559, 562, 85 S.Ct. 476, 479-80, 13 L.Ed.2d 487 (1965). Under the Iowa Constitution, a constitutional right may not be altered by ordinary legislation, but the constitution may be amended according to the procedures for amendment in article 10. Iowa Const, art. X, §§ 1-3.
If we held-that a statute might preempt an otherwise valid constitutional action, this would in effect grant ordinary legislation ■ the power to cabin constitutional rights. The Iowa Constitution would. no longer be the supreme law of the state. See Iowa Const, art. XII, § 1. The amendment process in article X of the Iowa Constitution would be rendered superfluous. We thus refuse to apply classic preemption doctrine to .the question of whether a Bivens-type damage remedy is available under the Iowa Constitution. See Greenway Dev. Co. v. Borough of Paramus, 163 N.J. 546, 750 A.2d 764, 770 (2000) (“A public entity may not use a state statute ... to abrogate a claimant’s constitutional rights.”); Wintergreen Grp., 171 P.3d at 420 (“A constitutional cause of action .., is presumptively superior to and must displace any statutory iteration that either conflicts with it or gives it less than full effect.”). .
V. Judicial Inaction Due to Adequacy of Legislative Remedy.
A. Introduction. We now consider, a question different than preemption. As indicated above, the central question in a preemption analysis is determining what the legislature intended when it enacted a statute. On the issue of adequacy, the decision-maker is the court. Specifically, the question here is whether the court believes the remedy provided by the Iowa Civil Rights Act should be considered sufficiently robust that the court should, as a matter of discretion, decline to allow plaintiff to pursue a parallel direct constitutional-claim for money damages.
B. Due Process Claims Based Upon Liberty and Property Interests. While much of Godfrey’s complaint focuses on discrimination based on sex or sexual orientation, Godfrey also has alleged that his property and liberty interests in em *876 ployment and in his reputation have been violated by the partisan motivation of the defendants. The claims are based on alleged violations of procedural and substantive due process.
The due process claims based on alleged partisan motivation in depriving Godfrey of property and liberty interests contrary to due process are not claims within the scope of the Iowa Civil Rights Act. As a result, there is no basis to assert that Iowa Code chapter 216 provides an adequate remedy to avoid the necessity of a freestanding damages claim. See Passman, 442 U.S. at 247, 99 S.Ct. at 2278 (holding when congressional staffer not in the competitive service not covered by Title VII, equal protection damages remedy available); Knutson v. Sioux Tools, Inc., 990 F.Supp. 1114, 1120 (N.D. Iowa 1998); Thompto v. Coborn’s Inc., 871 F.Supp. 1097, 1111 (N.D. Iowa 1994). As a result, the district court erred in dismissing Godfrey’s direct damages claim on these counts.
An amicus brief attacks the merits of Godfrey’s due process claims as being “vague” and generally inadequate. The state defendants, however, did not advance this question before the district court or on appeal. One of the disadvantages of interlocutory appeal is the piecemeal consideration of issues. Nonetheless, the question of the merits of Godfrey’s property claim cannot be resolved at this time. It goes without saying, of course, that we take no view on the merits of any due process claim raised in this case.
C. Adequacy of Legislative Remedy Under the Iowa Civil Rights Act. The Iowa Civil Rights Act provides a substantial remedy for discrimination of various kinds. No one can doubt that it is a substantial remedy, allowing recovery for back wages, front wages, emotional distress, and attorneys’ fees. There is caselaw from other states supporting the general principle that a constitutionally adequate statutory remedy may be sufficient to allow a court to decline to permit a parallel direct constitutional claim. See, e.g., Dilley v. Americana Healthcare Corp., 129 Ill.App.3d 537, 84 Ill.Dec. 636, 472 N.E.2d 596, 603 (1984); Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities, 64 Ohio St.3d 252, 594 N.E.2d 959, 965-66 (1992). As noted by the Supreme Court of Colorado, legislation implementing constitutional rights “is permissible as long as it does not directly or indirectly impair, limit, or destroy the rights that the executing ... provision provides.” Cacioppo v. Eagle Cty. Sch. Dist. Re-50J, 92 P.3d 453, 463 (Colo. 2004) (en banc). On this issue, three members of the court conclude that the Iowa Civil Rights Act does not preempt the plaintiffs Bivens-type constitutional claims, while a majority conclude that the district court properly dismissed Godfrey’s Iowa constitutional claims based upon Iowa equal protection principles because of the adequacy of remedies under the Iowa Civil Rights Act. What follows is a discussion of why three members of the court conclude the legislative remedy is inadequate and thus why the Bivens-type equal protection claims should be allowed to proceed.
In considering whether we should consider the adequacy of the Iowa Civil Rights Act for claims of discrimination in employment in violation of the equal protection clauses of the Iowa Constitution, there are two factors that give us pause. First, an independent constitutional claim advances separate interests. Second, the Iowa Civil Rights Act does not allow punitive damages. Ackelson, v. Manley Toy Direct, L.L.C., 832 N.W.2d 678, 689 (Iowa 2013).
A constitutional violation is different from an ordinary dispute between two private parties. As Justice Harlan noted in *877 Bivens, “[Ijnjuries inflicted by officials acting under color of law, while no less com-pensable in damages than those inflicted by private parties, are substantially different in kind.... ” Bivens, 403 U.S. at 409, 91 S.Ct. at 2011. When a constitutional violation is involved, more than mere allocation of risks and compensation is implicated. The emphasis is not simply on compensating an individual who may have been harmed by illegal conduct, but also upon deterring unconstitutional conduct in the future. As noted by one commentator, punitive damages are available to “express sharp social disapproval” as well as prevent recurrence of unconstitutional conduct. Thomas J. Madden et al., Bedtime for Bivens: Siibstituting the United States as Defendant in Constitutional Tort Suits, 20 Harv. J. on Legis. 469, 489-90 (1983) (emphasis added), Additionally, the United States Supreme Court noted that punitive damages “are especially appropriate to redress the violation by a Government official of a citizen’s constitutional rights.” Carlson, 446 U.S. at 22, 100 S.Ct. at 1473. Similarly, in Smith v. Wade, the Court emphasized that “society has an interest in deterring and punishing all intentional or reckless invasions of the rights of others.” 461 U.S. 30, 54, 103 S.Ct. 1625, 1639, 75 L.Ed.2d 632 (1983) (first emphasis added). Vindication of the social interest is distinct from adequate compensation goals of tort law and most statutory remedies, including those under Iowa Code chapter 216.
Bivens, Carslon, and Smith thus teach that a constitutional claim is designed “to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of popular will.” Rosalie Berger Levinson, Recognizing a Damage Remedy to Enforce Indiana’s Bill of Rights, 40 Val. U. L. Rev. 1, 11 (2005) (quoting Bivens, 403 U.S. at 404, 91 S.Ct. at 2008); see also Sommers, 337 N.W.2d at 472 (distinguishing between civil liberties protected by the Constitution and civil rights claims which are enforceable by statute). The focus in a constitutional tort is not compensation as much as ensuring effective enforcement of constitutional rights. Michael Wells, Punitive Damages for Constitutional Torts, 56 La. L. Rev. 841, 858-62 (1996) [hereinafter Wells, Punitive] (noting constitutional torts protect different interests and the focus on a constitutional tort is not on compensation but on development of an effective system of constitutional remedies). The harm to society is not captured by a judgment that solely compensates a plaintiff for his injury. See Michael Wells, Constitutional Remedies, Section 1983 and the Common Law, 68 Miss. L.J. 157, 189 (1998). A gap thus exists between the injury incurred by the plaintiff and the total harm to society caused by a constitutional violation. See id. Constitutional torts and common law torts thus protect different interests. Wells, Punitive, 56 La. L. Rev. at 863.
A number of cases agree with the notion that constitutional rights are distinguishable from common law or statutory claims. See Laird, 884 F.Supp. at 1284 (holding remedial scheme of social security act designed to vindicate statutory rights not constitutional rights); Wintergreen Grp., 171 P.3d at 422 (“[Ojwing to its different lineage, a constitutional cause of action can never be preempted by statute, regardless of how fully the statute honors the contours of the constitutional claim.”). Because the interests being vindicated are different, parallel claims are appropriate. See Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 461, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975) (noting that remedies available under Title VII “although related, and although directed to most of the same ends, are separate, distinct, and inde *878 pendent” from claims of discrimination under 42 UjS.C. § 1981), Consistent with the distinction between constitutional torts and common law tort or statutory claims, federal courts have frequently held that punitive damages are available in constitutional tort cases when no compensatory damages are awarded, while punitive damages in other cases are generally not available absent compensatory damages. See William H. Volz & Michael C. Fayz, Punitive Damages and the Due Process Clause: The Search for Constitutional Standards, 69 U. Det. Mercy L. Rev. 459, 498 nn.188 & 189 (1992) (citing cases).
The difference between a purely private claim and a constitutional claim which necessarily involves a strong social interest in enforcement is illustrated by the importance of the availability of punitive damages. The substantial traditional authority for the proposition that the availability of individual liability for punitive damages is an important factor in determining whether a court should permit a direct action for money damages. In Ruckle, the Lord Chief Justice conceded that the actual damages were small, but defended the jury’s award of £ 300, noting, “I think they have done right in giving exemplary damages.” 95 Eng. Rep. at 769. Similarly, in Ashby v. While, the jury awarded the hefty sum of £ 200 for violation of the right to vote. (1703) 92 Eng. Rep. 126, 127-28. Historically, then, punitive damages played an important role in the enforcement of individual rights against the government.
There is caselaw from the United States Supreme Court that supports the importance of punitive damages in the panoply of constitutional remedies. In Carlson, the Court noted the lack of -availability of punitive damages- was an important factor in finding that a remedial scheme was inadequate to protect constitutional rights. 446 U.S. &t 22, 100 S.Ct. at 1473. The Carlson approach was consistent with Frazier v. Parsons, where the Supreme Court of Louisiana declared
“the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures would be a mockery if courts .,. failed to inflict exemplary damages for the wanton abuse of the personal liberty and private rights of property.
24 La. Ann. 339, 341 (La. 1872) (emphasis omitted).
Other authorities agree. For instance, in Dunbar Corp. v. Lindsey, the Fourth Circuit noted that “[t]he underlying purpose of the Bill of Rights is to protect the people from the power of the government,” 905 F.2d 754, 763 (4th Cir. 1990). Further, the Fourth Circuit noted that if a Bivens-type action were not found, the claimant lacked any remedy effective against individual defendants and for punitive damages.[8] Id.; see also Taylor v. Bright, No. 00-6676, 2000 WL 1144624, at *2 (4th Cir. Aug. 14, 2000) (per curiam) (citing lack of punitive damages or injunctive.relief under Federal Tort Claims Act as not barring § 1983 action). Similarly, in Newell v. City of Elgin, the Illinois court noted -the -lack of exemplary damages against a municipality in a statutory scheme as being, a factor in allowing a Bivens claim. 34 Ill.App.3d 719, 340 N.E.2d 344, 350 (1976). Conversely, it is. sometimes said that an administrative remedy was. adequate because the *879 plaintiff could recover punitive damages. Bishop v. Holy Cross Hosp. of Silver Spring, 44 Md.App. 688, 410 A.2d 630, 632 (1980).
The necessity of the availability of punitive damages in light of the social interests in enforcement of constitutional rights as contrasted to private claims has support in modem caselaw. As noted in Bivens, a government official acting unlawfully in the name of the state “possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own.” 403 U.S. at 392, 91 S.Ct. at 2002 (majority opinion). We recognize, however, that there .is authority to the contrary. See Provens, 594 N.E.2d at 965 (holding statutory remedies adequate even though not equal to the other remedies that might be available). But the social interest in enforcement of constitutional claims, supported by punitive damages as in Wilkes, Huckle, and Entick, demonstrates the distinctive nature of constitutional harms.
An amicus brief raises the concern about dampening the ardor of the Governor and other public-officers in the exercise of their duties. But this argument, in fact, cuts in favor of a cause of action for damages. History is replete with examples of powerful public figures who, in their desire to do good, have trampled on the constitutional rights of the people. As Justice Brandéis observed, “Experience should teach us to be most on our guard, to protect liberty when the government’s purposes are beneficent.” Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), overruled in part on other grounds by Berger v. New York, 388 U.S. 41, 50-51, 87 S.Ct. 1873, 1879, 18 L.Ed.2d 1040 (1967).
In any event, to the extent that a Bivens-type action might inhibit their duties, the doctrine of qualified immunity is the appropriate vehicle to address those concerns. The state courts that have considered whether immunity applies in Bivens-type actions are divided. See, e.g., Moresi, 567 So.2d at 1093 (holding qualified immunity applies); Corum, 413 S.E.2d at 291 (holding no qualified immunity). The issue of qualified immunity, however, is not before the court today.
In conclusion, for the above reasons, we think the different nature of the interests protected weighs in favor of allowing a Bivens-type claim to go forward against the defendants. We do not find authority to the contrary persuasive.,
D. The Question of “Special Factors.” An amicus brief in this case suggests that we should decline-to find a direct monetary cause of action in this case because of “special factors.” As the amici correctly point out, the United States Supreme Court has developed a special-factors doctrine which allows the Supreme Court to decline to permit a direct, damage action for a constitutional violation to go, forward. See United States v. Stanley, 483 U.S. 669, 678-84, 107 S.Ct. 3054, 3061-64, 97 L.Ed.2d 550 (1987); Bush, 462 U.S. at 380, 103 S.Ct. at 2413. The question of whether special factors are present under the United States Supreme Court cases goes to the appropriateness of the remedy,, not to the court’s remedial power.'
The special-factors doctrine is a stan-dardless exception that provides the court with a convenient escape hatch. In other words, a Bivens claim exists- except where a majority of the court finds it inconvenient. To the extent it has any appeal, the special-factors exception has some purchase when applied to the federal government’s military operations. In Chappell, the Supreme Court held that , because of the unique disciplinary structure of the military, it would not allow a Bivens-type action by an .enlisted seaman who brought *880 a discrimination claim against superiors. 462 U.S. at 304, 103 S.Ct. at 2368. Further, there is at least arguably a textual commitment to a different constitutional regime arising under the powers of the President as commander-in-chief.
But we see no basis for implementing a special-factors doctrine here. First, there is a preservation problem. The issue of special factors was not raised in the State’s appellate brief. See Meier v. Senecaut, 641 N.W.2d 532, 537 (Iowa 2002) (declining to consider issue which was not argued). Second, on the facts presented, we are not prepared to announce the adoption of the amorphous, ad hoc special-factors doctrine. Instead, as noted above, concerns about dampening the ardor of executive officials should be addressed through other channels such as the availability of qualified immunity.
VI. Conclusion.
For the above reasons, the holding of the district court in this matter is reversed as to Counts VI and VII. We emphasize our holding is based solely on the legal contentions presented by the parties. We express no view on other potential defenses which may be available to the defendants and no view whatsoever on the underlying merits of the case. We hold only that the defendants are not entitled to summary judgment on Counts VI and VII based on the legal contentions raised in this appeal. Costs on appeal are to be taxed one-half to Godfrey and one-half to the defendants.
AFFIRMED IN PART AND REVERSED IN PART.
Wiggins and Hecht, JJ., join this opinion. Cady, C.J., joins in part and files a concurrence in part and dissent in part. Mansfield, Waterman, and Zager, JJ., dissent.

. After, filing this interlocutory appeal, God-frey voluntarily dismissed counts XII, XIII, XIV, XV, XVII, XVIII, and a second count labeled "XIV.” These were defamation counts brought against various individual defendants; No other c'ounts were dismissed, including the counts raising Bivens-type claims against the individual defendants. . ;

. Gay Law Students Ass'n v. Pac. Tel. & Tel. Co., 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592, 602 (1979) (recognizing action against a public utility for employment discrimination against homosexual employees and cites Bivens but does not expressly discuss availability of damages); Laguna Publ'g Co. v. Golden Rain Found. of Laguna Hills, 131 Cal. App. 3d 816, 854 (Ct. App. 1982) (recognizing action for damages under California Constitution); Binette v. Sabo, 244 Conn. 23, 710 A.2d 688, 693 (1998) (recognizing state Bivens action for violations of search and seizure and personal liberty provisions); Newell v. City of *857 Elgin, 34 Ill.App.3d 719, 340 N.E.2d 344, 349 (1976) (recognizing state Bivens action for violation of search and seizure); Moresi v. State, 567 So.2d 1081, 1093 (La. 1990) (recognizing state Bivens right for violations of search and seizure, but declining to award recovery because state officials possessed qualified immunity); Widgeon, 479 A.2d at 928 (recognizing Bivens actions for search and seizure, deprivation of liberty, life, and property); Manikhi v. Mass Transit Admin., 360 Md. 333, 758 A.2d 95, 111 (2000) (recognizing a claim for damages under equal protection provision of state constitution); Phillips v. Youth Dev. Program, Inc., 390 Mass. 652, 459 N.E.2d 453, 457 (1983) (approving of Bivens actions generally, but dismissing the case because parties failed to argue state action); Johnson v. Wayne County, 213 Mich. App. 143, 540 N.W.2d 66, 69-70 (1995) (recognizing due process right for damages under Michigan Constitution, but finding that factually plaintiff failed to allege discriminatory legislation); Mayes v. Till, 266 So.2d 578, 580 (Miss. 1972) (summarily holding right of damages available for violation of search and seizure); Stringer v. State, 491 So.2d 837, 849 (Miss. 1986) (Robertson, J., concurring) (acknowledging "theoretical” possibility of Bivens remedy for damages for violation of search and seizure and citing Mayes and noting, however, this remedy is "as ineffective as a deterrent to police misconduct as it is ineffi-cacious to protect and compensate the citizen”); Dorwart, 58 P.3d at 137 (recognizing implied action for damages for violation of right to privacy); Jackson v. Consol. Rail Corp., 223 N.J.Super. 467, 538 A.2d 1310, 1319 (1988) (involving discrimination-based claim for damages under state constitution, among other claims); Strauss v. State, 131 N.J.Super. 571, 330 A.2d 646, 649 (N.J. Super. Ct. Law Div. 1974) (recognizing Bivens claims under state constitution); Brown, 652 N.Y.S.2d 223, 674 N.E.2d at 1144 (recognizing Bivens-type claim of racial discrimination under New York Constitution); Corum v. Univ. of N.C., 330 N.C. 761, 413 S.E.2d 276, 290 (1992) (recognizing Bivens action for violation of state free speech rights); Jones v. Mem’l Hosp. Sys., 746 S.W.2d 891, 893-94 (Tex. App. 1988) (recognizing implied damages action for violation of Texas free speech right); Old Tuckaway Assocs. Ltd. P’ship v. City of Greenfield, 180 Wis.2d 254, 509 N.W.2d 323, 328 n.4 (App. 1993) (summarily recognizing Bivens actions under the Wisconsin Constitution). But see Dolan v. Bay Const. Grp. Co., No. 924947, 1994 WL 879528, at *3 & n.3 (Mass. Super. Ct. Nov. 9, 1994) (dismissing plaintiffs claim of handicap discrimination under state constitution because of an adequate statutory remedy); Smith v. Dep’t of Pub. Health, 428 Mich. 540, 410 N.W.2d 749, 789-90 (1987) (containing a full discussion of Bivens, but declining to find a viable Bivens action under 1908 Michigan Constitution after adoption of 1963 Michigan Constitution).

. Dick Fischer Dev. No. 2, Inc. v. Dep’t of Admin., 838 P.2d 263, 268 (Alaska 1992) (will only recognize a Bivens action in cases of “flagrant constitutional violations where little or no administrative remedies are available”); Bd. of Cty. Comm’rs v. Sundheim, 926 P.2d 545, 553 (Colo. 1996) (agreeing that policy considerations weigh heavily against judicial creation of a state Bivens action, but noting that it “may be appropriate to recognize an implied state constitutional cause of action when there is no other adequate remedy”); Garcia v. Reyes, 697 So.2d 549, 550 (Fla. Dist. Ct. App. 1997) (per curiam) (no implied cause of action for damages under due process clause); State Bd. of Educ. v. Drury, 263 Ga. 429, 437 S.E.2d 290, 294 (1993) (explaining court is not able to fashion a Georgia Bivens remedy because of sovereign immunity); Figueroa v. State, 61 Haw. 369, 604 P.2d 1198, 1205 (1979) (refusing to recognize state Bivens action because state’s sovereign immunity would render any Bivens claim ineffective); St. Luke Hosp., Inc. v. Straub, 354 S.W.3d 529, 537-38 (Ky. 2011) (declining to create a Bivens remedy because adequate alternative remedies exist, but noting that the holding was limited to the facts of this case); Moody v. Hicks, 956 S.W.2d 398, 402 (Mo. Ct. App. 1997) (rejecting claim that state constitutional provision barring unreasonable search and seizure is "self-executing” such that the court should imply an action for damages); Rockhouse Mountain Prop. Owners Ass'n, Inc. v. Town of Conway, 127 N.H. 593, 503 A.2d 1385, 1388 (1986) (declining to recognize a Bivens remedy for the equal protection and due process claims in this case because damages not appropriate remedy for alleged constitutional violation in municipal decision in road construction); Provens v. Stark Cty. Bd. of Mental Retardation & Developmental Disabilities, 64 Ohio St.3d 252, 594 N.E.2d 959, 961 *858 (1992) (explaining that the court would imply a Bivens-type action if there were no alternate remedies available); Hunter v. City of Eugene, 309 Or. 298, 787 P.2d 881, 884 (1990) (expressing reluctance to create any implied action for damages for violation of the state constitution, and particularly finding itself in a poor position to say what would be just compensation for violation of free speech rights); Jones v. City of Philadelphia, 890 A.2d 1188, 1215 (Pa. Commw. Ct. 2006) (not recognizing a Bivens claim under state constitution for violation of search and seizure and arguing, among other reasons, enormous financial burden and chilling effect on state officials); Bandoni v. State, 715 A.2d 580, 587 (R.I. 1998) .(declining to find that a victims’ rights amendment to the state , constitution was self-executing); Lee v. Ladd, 834 S.W.2d 323, 325 (Tenn. Ct. App. 1992) (summarily noting that Tennessee courts do not recognize state Bivens actions); Spackman ex rel. Spackmman v. Bd. of Educ. of Box Elder Cty. Sch. Dist., 16 P.3d 533, 538 (Utah 2000) (limiting Bott v. DeLand, 922 P.2d 732, 739 (Utah 1996), which recognized a state Bivens action for cruel and unusual punishment violations); Gray v. Rhoads, 55 Va. Cir. 362, 2001 WL 34037320 at *6-8 (2001) (predicting Virginia Supreme Court would decline to allow Bivens causes of action under state constitution and additionally finding adequate alternative remedies). But see Smith v. Arthur C. Baue Funeral Home, 370 S.W.2d 249, 254 (Mo. 1963) (pre-Bivens case summarily recognizing implied action for damages under state constitution provision ensuring the right to collectively bargain).

. As described above, the Restatement (Second) states that when a statute or constitu *859 tional provision protects a class of person , by mandating or prohibiting certain conduct but does not provide for a civil remedy for a violation, a court may provide' an injured member of the class with a right of action in tort if the court determines that the remedy furthers the purpose or is needed to ensure the effectiveness of the provision. Restatement (Second) § 874A & cmt. a, at 301; see Brown, 652 N.Y.S.2d 223, 674 N.E.2d at 1138. The New York Court of Appeals also noted that many state courts rely on the reasoning of Bivens. Brown, 652 N.Y.S.2d 223, 674 N.E.2d at 1138.
The underlying rationale for the decision, in simplest terms, in that constitutional guar-atitees are worthy of protection .on their own terins without being linked, to some common-law or statutory tort, and that the courts have the obligation to enforce these rights by ensuring that each individual receives an adequate remedy for the violation of a constitutional duty.
Id. If the government fails to provide such a remedy, the courts must provide it themselves. Id. The court explained that both Bivens and the Restatement (Second) support one another and cited a number of state court decisions that have recognized these principles and applied them to their own constitutions. Id.

. For example, article III, sections 34 and 35 provided that the general assembly shall fix the number of senators “by law,” and shall "fix” the ratio of representatives. Iowa Const, art. Ill, §§ 34 & 35. Article. IV, section 5 stated the general assembly shall provide for contested elections "in such manner as may be prescribed by law.” Id. art. IV, § 5. Article IV, section 16 declared the Governor may remit fines and forfeitures in such manner "as may be prescribed by law.” Id. art. IV, § 16. Article V, section 12 stated the general assembly shall "provide, by law” for the election of an attorney general. Id. art. V, § 12. Article V, section 14, declared it is “the duty of the General Assembly to provide for the carrying into effect of this [judicial] article.” Id. art. V, § 14. Article V, section 6 declared district courts shall have jurisdiction “as shall be prescribed by law.” Id. art. V, § 6. Article VIII, section 1 declared the general assembly "shall provide, by general laws” for the organization of all corporations. Id, art. VIII, § 1, Article IX, section 5 declared the general assembly "shall take measures for the protection, improvement, or other disposition” of public land. Id. art. IX:2, § 5. Article IX, section 7 declared that school funds may be distributed "as may be provided by the General Assembly.” Id. art. IX:2, § 7. Article X, section 1 stated the general assembly "shall provide by law” for the publication of proposed amendments to the constitution and the election of delegates to the constitutional convention. Id. art. X, § 1.

. A leading commentator of the Iowa Constitution, Benjamin F. Shambaugh, notes that the proposed Iowa Constitution of 1844 contained an article XIII, he describes as "a 'Schedule' for transition from Territorial to State organization.” Shambaugh, at 153. Shambaugh further notes that the Iowa Constitution of 1846 also had a schedule article, article XIII. Id. at 197. It provided that the Governor should proclaim the time to hold the first general election within three months of the constitution's adoption, the Governor should set the date of the first meeting of the general assembly, and that the first general assembly must meet within four months of ratification. Id. at Í97-98. With respect to the Iowa Constitution of 1857, Shambaugh notes that article XII, also entitled "Schedule,” provided for election of officers under the new constitution, a provision for submitting the constitution to the people for ratification, and a provision for an election to strike the word "white” from the article on the Right of Suffrage. Id. at 279-80. Shambaugh does not suggest that any of these "Schedule” articles had dramatic implications for the scope of the rights and remedies established in article I of any of the Iowa Constitutions.

. The defendants make no direct or indirect argument in their brief with respect to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, the Iowa Tort Claims Act, Iowa Code chapter 669, or to the doctrine of sovereign immunity. The defendants’ briefing focuses solely on Iowa caselaw considering whether the Iowa Civil Rights Act preempts common law claims and argues, by analogy, that Iowa constitutional claims should also be preempted.

. The Iowa Civil Rights Act allows for individual liability for supervisors. It is not clear whether all of the defendants are supervisors, See Vivian v. Madison, 601 N.W.2d 872, 874 (Iowa 1999). To the extent the individual defendants are not "supervisors” of Godfrey, they are not within the scope of the Iowa Civil Rights Act and there is no adequate remedy as to them,